**Arnulfo M. DIAZ, et al., Plaintiffs,**

v.

**SAN JOSE UNIFIED SCHOOL DISTRICT, et al., Defendants.**

No. C–71–2130 RFP (SJ).

United States District Court, N. D. California.

July 15, 1981.

Cynthia L. Rice, Community Legal Services, San Jose, Cal., for plaintiffs Arnulfo M. Diaz, et al.

Michael di Leonardo, Sunnyvale, Cal., for defendants San Jose Unified School District, et al.

## MEMORANDUM AND ORDER

PECKHAM, Chief Judge.

### I PROCEEDINGS

This suit was originally instituted in 1971. Plaintiffs, on behalf of a class of all Spanish-surnamed students enrolled in the San Jose Unified School District ("SJUSD") and their parents, charged that the School District was operating a segregated public school system in violation of the equal protection clause of the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983. Jurisdiction is founded in 28 U.S.C. §§ 1343(3) and 1343(4).

This case is now before the Court on remand from the Ninth Circuit Court of Appeals, 612 F.2d 411 (1979), after this court initially ruled in favor of the defendants after trial on the merits. 412 F.Supp. 310 (1976). The procedural history of this matter up until the point of that initial judgment in this court, as well as the general factual background of the case, may be found in our initial opinion, 412 F.Supp. at 311–15, and need not be repeated here. The Ninth Circuit, upon appeal, vacated the judgment of this court and remanded the matter to us for further proceedings, in light of the decisions of the United States Supreme Court in *Columbus Board of Education v. Penick*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 ("*Columbus*"), and *Dayton Board of Education v. Brinkman*, 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 ("*Dayton*") (1979), and in light of the Circuit Court's opinion issued in conjunction with the remand.

After the Ninth Circuit's mandate issued in February of 1980, this court ordered both sides to brief and argue their proposals for further proceedings in light of the remand decision. After a hearing held on June 4, 1980, this court ordered the case decided on the existing evidentiary record, and instructed both sides to file briefs addressing the question of whether the Ninth Circuit opinion remanding this case and the decisions in *Columbus* and *Dayton* compel a result different from this court's previous judgment. Oral argument was held on this issue on October 31, 1980.

This court has conducted an extensive review and consideration of this matter. We have studied the Ninth Circuit's remand opinion and the two Supreme Court rulings, as well as other Supreme Court and lower court cases which have addressed issues relevant to this matter. We have conducted a complete review of the transcript of the original trial on the merits, as well as the transcripts of the hearing on the request for a preliminary injunction, which was conducted in 1971. We have also carefully

re-examined the exhibits introduced into evidence by both sides in connection with this case. The court concludes that it must once again find in favor of the defendants. For the reasons discussed below, the evidence in the record does not, on balance, support a finding of segregative intent, a finding necessary under federal law in order to impose liability on the defendants.

## II DAYTON AND COLUMBUS

On remand, the Ninth Circuit ordered that this court reconsider the evidence in this case in light of the Supreme Court decisions in *Dayton* and *Columbus*, which were decided on the same day at the end of the October 1978 Term.

*Dayton* involved a school system which the Court of Appeals had found was *de jure* segregated at the time of the decision in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) ("*Brown*"). As such, it was under a continuous affirmative duty since that time to dismantle that dual system, "to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green v. County School Board*, 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1693–94, 20 L.Ed.2d 716 (1968); *see also Columbus*, 443 U.S. at 458–59, 99 S.Ct. at 2947. The Court of Appeals had found that in a number of different instances, the Dayton school authorities had failed to take steps to fulfill this affirmative obligation to dismantle the segregated system. The Supreme Court's decision upheld the conclusions of the Court of Appeals 1) that there was a *de jure* system of segregated schools in place at the time of the decision in *Brown v. Board of Education, supra*, 2) that this meant that the school district was under an affirmative obligation since that time to dismantle that segregated system, and 3) that the school district had failed to fulfill that obligation.

The case before this court is in a much different posture. There was no evidence, nor any contention by the plaintiffs, that a *de jure* system of segregated schools existed at the time of *Brown*. Rather, vir-

tually all the evidence in this case focused on the actions of the school authorities commencing in 1963, when the school board first acknowledged the need to eliminate segregation. Having not established any pre-*Brown de jure* system of segregation, the plaintiffs cannot rely on any continuing obligation on the part of the school district to dismantle such a segregated system by affirmative acts of integration. Rather, the plaintiffs are obliged to show that the segregation which exists in the schools was brought about by purposeful discrimination by state officials. As this court noted in its prior decision, 412 F.Supp. at 328–29, *Keyes v. School District No. 1*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973) established that evidence of the *de facto* segregation of schools is not sufficient to prove a violation of the fourteenth amendment; rather, the plaintiff must prove not only that the defendants' actions created or maintained racial or ethnic imbalance in the schools, but also that those actions were motivated by segregative intent.

This, of course, brings us to the heart of the problem facing the courts and the crux of the difficulties which led the Court of Appeals to remand this case to this court. From what actions, circumstances, and explanations is the court to infer segregative intent? What evidence supports such an inference, and what countervailing evidence is sufficient to counter such an inference?

The Supreme Court offered some guidance on this issue in *Dayton*. It stated that proof of foreseeability is not to be taken, as a general proposition, to make out a *prima facie* case of segregative intent, nor does it routinely shift the burden of persuasion to the defendants. The court then stated, "[o]f course, as we hold in Columbus today, ... proof of foreseeable consequences is one type of quite relevant evidence of racially discriminatory purpose...." 443 U.S. at 536 n.9, 99 S.Ct. at 2978 n.9. The Court rejected any hard and fast rule on the inferences to be drawn from, and importance to be placed on, evidence that state officials took actions which would have the natural, probable and foreseeable

consequences of perpetuating segregation. The Court considered it simply one of many types of evidence which must be weighed in the balance of the overall case.

The decision in the *Columbus* case contains more guidance applicable to the case presently before this court. In that case, the lower courts had found that, while there was a *de jure* system of segregation in place in Columbus at the time of the *Brown* decision, there had also been several acts of intentional segregation after 1954. In upholding the latter finding of the district court, the Supreme Court pointed to several types of evidence of direct relevance to the San Jose situation. The Court noted in particular the evidence in the record concerning the selection of sites for new schools in Columbus. Since 1950, 103 schools had been built in Columbus; 87 opened with racially identifiable student bodies. The Court noted that this segregative result was "reasonably foreseeable under the circumstances in light of the sites selected." It went on to note, however, that there was no need to rely on an inference of discriminatory purpose based on the reasonable foreseeability of the segregative consequences of the district's choice of sites, for the record reflected that the school board had been specifically warned about the segregative consequences of its actions and that alternatives had been proposed which would have increased integration. 443 U.S. at 462–63 n.11, 99 S.Ct. at 2980 n.11.

The Court also put great emphasis on the fact that the board of education was presented with many recommendations over the years which would have countered some of the segregation in the Columbus system; the school board consistently refused to follow up on any of those recommendations. These failures to act were particularly important because "the Columbus system grew rapidly in terms of geography and number of students, creating many crossroads where the Board could either turn toward segregation or away from it." 443 U.S. at 463 n.12, 99 S.Ct. at 2980 n.12. Under all these circumstances, the Supreme Court upheld the district court's inference of segregative intent " 'from the Columbus defendants' failures, after notice, to consider predictable racial consequences of their acts and omissions when alternatives were available which would have eliminated or lessened racial imbalance.' " *Id., quoting* 429 F.Supp. 229, 240 (S.D.Ohio 1977).

The Court, in *Columbus*, also reiterated the use of evidence of foreseeable segregative effect to infer segregative intent. It emphasized, as it did in *Dayton*, that evidence of foreseeable consequences of actions, without more, is not sufficient to establish a constitutional violation. The Court stressed that the issue to be addressed by the trial court is whether or not the state officials acted with a "forbidden purpose." Foreseeable effects is simply one kind of evidence among other types from which an inference of intent or purpose can be drawn. Again, the Court made it clear that the role of the trial court is to weigh this evidence, along with, and in the context of, all the rest of the evidence, and decide whether an inference should be drawn that the state officials made the decisions which led to the segregative result with discriminatory or segregative intent. 443 U.S. at 464–65, 99 S.Ct. at 2950.

### III *OTHER SUPREME COURT CASES*

The court has also re-evaluated the record in this case in light of three other decisions handed down by the Supreme Court since the trial of this case. These decisions all attempt to demark more clearly the barrier in the law between actions which result in segregation or disparate impact on a racial or ethnic group and actions which are motivated by the intent or purpose to discriminate. The latter actions are subject to liability under federal law; the former are not.

In *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the Supreme Court rejected the notion that discriminatory impact of, or result from, state action is sufficient to support a finding of a constitutional violation. The Court insisted that a discriminatory purpose had to be

found to make out a violation under the Fourteenth Amendment. *Id.* at 239–42, 96 S.Ct. at 2047, 2049. That purpose had to be found from the examination of the totality of the facts, and while impact might on occasion suffice to show discriminatory intent, this would be true in those cases where the decisions or actions which caused the discriminatory impact were not explainable on nonracial grounds. *Id.* at 242, 96 S.Ct. at 2049.

The type of evidence which might be relied on to infer discriminatory purpose was further elaborated on by the Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). In that case, the Court reiterated that the discriminatory purpose of the decision-makers had to be shown to be at least a motivating factor in their actions. Evidence of discriminatory impact, while perhaps providing some support for such a finding in the overall context of the specific case, was not in and of itself sufficient. *Id.* at 265–268, 97 S.Ct. at 563, 564. The Court listed four other factors, along with impact, which might be determinative of the issue of discriminatory purpose: 1) the historical background of the decision; 2) the specific events surrounding the decision; 3) any departures from the normal procedure of decision-making; and 4) any legislative or administrative history related to the issue or subject decided. *Id.* There is no indication that this list was meant to be exhaustive of the evidence to be looked to by the trial court in determining the issue of discriminatory purpose. It is simply illustrative of the process in which the trial court must engage in deciding whether the objective facts support an inference of the ultimate relevant subjective fact, intent to discriminate.

Finally, the Court shed further light on the role of the foreseeability of discriminatory impact of a decision in the trial court's evaluation of intent in *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). In the course of rejecting a claim of unconstitutional discrimination against women in the operation of Massachusetts' veteran preference laws, the Court explicitly rejected the idea that the foreseeability of the discriminatory impact of an action is, in and of itself, sufficient to support a finding of discriminatory intent and, hence, of liability. The Court wrote:

> "Discriminatory purpose," however, implies more than intent as volition or intent as awareness of consequences.... It implies that the decision-maker ... selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.

*Id.* at 279, 99 S.Ct. at 2296 (citation omitted; footnotes omitted). The court again, however, made it clear that the necessary intent must generally be gleaned from objective evidence, and an important aspect of that inquiry is the results achieved or avoided by the officials' actions. *Id.* at 279 n.24, 99 S.Ct. at 2296 n.24. Also important is the inevitability or foreseeability of the adverse impact. *Id.* at 279 n.25, 99 S.Ct. at 2296 n.25. But the Court cautioned, "an inference is a working tool, not a synonym for proof." *Id.* In the case the Court was considering, it conceded that an inference of discriminatory intent might be drawn from the inevitability of the adverse impact on women of the statute in question, but the legitimacy of the underlying legislative policy and the rest of the evidence mitigated that inference and prevented it, in the Court's analysis, from "ripen[ing] into proof." *Id.*

These three cases lend further support to the guidelines to our inquiry found in *Dayton* and *Columbus.* The court is to focus clearly on the question of segregative intent. The inevitability and foreseeability of racial imbalance resulting from official decisions is relevant evidence to be weighed, but it is not probative without further examination of the context of, and other evidence concerning, the actions and decisions of the officials. Inferences to be drawn from the effects of decisions must be supported by the other evidence, or there can be no finding of liability. Otherwise, the

court would be holding the state officials responsible for the consequences of their decisions, rather than holding them responsible only when the court is convinced that the decisions were at least in part motivated by an improper intent or purpose. This, the Supreme Court has made repeatedly clear in recent years, would be improper.

## IV THE NINTH CIRCUIT OPINION

The Ninth Circuit, in remanding this case, explicitly disclaimed any intention to direct this court on how to balance the evidence in this case on the ultimate question of segregative intent. 612 F.2d at 416 n.2. Nor did the Court suggest that any of the findings of fact made by this court were inaccurate or erroneous. Rather, the Ninth Circuit's difficulty arose with the manner in which this court articulated the process of weighing the evidence and drawing a conclusion as to the existence of segregative intent. As this court reads the Circuit Court's opinion, it was concerned with the following aspects of this court's prior decision: 1) the acts and decisions by the school authorities as recounted by this court, 412 F.Supp. at 315–28, all either exacerbated or did nothing to improve the racial balance in the San Jose schools, 612 F.2d at 414; 2) to mitigate whatever suggestion of intent arose from those actions, the defendants appeared, from our recitation of the facts, to rely solely on the fact that their decisions were based on the application of a racially neutral and consistently applied neighborhood school policy. Id. This court's decision could be read, and was read by the Circuit Court, to suggest that the district's racially neutral neighborhood school policy "constituted either a complete defense to a charge of segregative intent, or, completely dispelled the inferences of segregative intent that flowed from the [plaintiffs'] proof." Id. at 415.

The Ninth Circuit held that the simple invocation of a neighborhood school policy, without a more complete analysis of its origins, its application, and the available alternatives, is not a defense, in and of itself, to the inferences of segregative in-tent which arose from the plaintiffs' proof. Id. The district court's attention must remain focused on the ultimate factual issue: segregative purpose. How the invocation of a neighborhood school policy impacts on that ultimate fact depends on a lot more than the simple fact of its existence. This is particularly true because the fact of a neighborhood school policy does not, on its face, have any impact on decisions such as the location and size of new schools, and the choice of old schools to close. Id. In fact, as the Circuit Court pointed out through its lengthy quotation from Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 20–21, 91 S.Ct. 1267, 1278–79, 28 L.Ed.2d 554 (1971), decisions on site location and size of schools (and, likewise, decisions on which schools to close), when combined with a neighborhood school policy, will define the neighborhood and have reciprocal effects on the racial and ethnic composition of other schools in the district. Moreover, these very choices have a profound effect on the further developments of neighborhoods: the opening of a racially identifiable school is likely to result in the further segregation of the housing patterns in the neighborhoods served by that school.

For all these reasons, the Circuit Court was concerned that this court's earlier opinion seemed too quick to accept the simple invocation of a neighborhood school policy as a ready and sufficient explanation to dispel any inferences of segregative intent which arose from the consistent and foreseeable segregative results of virtually all the decisions and choices made by school officials which were discussed in our initial decision. While one judge of the three-judge circuit panel felt that this court had demonstrated that it had carefully weighed all the competing evidence before concluding that there was insufficient evidence of segregative intent, the majority felt that our apparent complete reliance on the defense of the neighborhood school policy required that the case be sent back to this court for a more complete weighing of the evidence in light of the majority's admonition that "[s]trict adherence to a neighborhood policy is no more than circumstantial

evidence that bears upon the existence or nonexistence of segregative intent. The existence of such a policy is not enough to prove the absence of segregative intent." *Id.* 612 F.2d at 416.

With the guidance of the Supreme Court cases and the Ninth Circuit opinion in mind, the court now turns back to the evidence in this case.

## V FACTS

There is little quarrel with the findings of fact made by this court in its initial decision. The plaintiffs have stated that they "have never quarreled with the vast majority of the Court's findings of evidentiary facts." Plaintiffs' Memorandum in Support of Judgment on Remand, filed August 4, 1980, at 11. The defendants, while making suggestions for additional findings of fact, have not disputed as clearly erroneous any of the findings of the initial opinion. Nor did the Court of Appeals suggest that its remand was based on any dispute over the findings of fact which this court made in its decision. On the contrary, the Court of Appeals felt that this court, given those facts, had not justified sufficiently either its unwillingness to draw an inference of segregative intent from those facts or its willingness to infer a complete defense to any such inferences in the existence of a consistent and neutral neighborhood school policy. Therefore, this court is prepared to rely principally on the organization and factual findings of its initial decision. Some additional findings will be made, but these are not in the nature of contradictory or radically new departures from the initial decision. Rather, they are based on additional evidence, readily discoverable in the record of this case, which helps to fill in the picture of the school officials' actions in the manner demanded by the Court of Appeals.

The findings of fact in this case, as set out in this court's initial opinion, found at 412 F.Supp. 310, are hereby incorporated into this opinion, except as modified in the discussion which follows.

In order to comply as completely as possible with the Circuit Court's instructions, the court will discuss the evidence under the same categories as it did in its initial opinion and attempt to explain, to the satisfaction of the Court of Appeals, why the court does not feel that the evidence, on balance, supports a finding of segregative intent by the school officials of the San Jose Unified School District.

As a preliminary matter, the court wishes to highlight certain general facts concerning this district which are crucial to understanding the ultimate findings of this court. These facts are all found in our initial decision, but they bear emphasis by repetition here in light of the Ninth Circuit's concerns.

This district is long and narrow in shape, extending approximately 16 air miles in length and varying in width from a maximum of four miles to a minimum of one and one-half air miles. The evidence in this case did not indicate any manipulation of the boundaries of this district such as would raise suspicions that the demarcation of the district itself was designed to perpetuate segregation. The only changes made in the boundaries of the district since 1950 have been the annexations in 1956 of the Sunol School District and the Almaden Elementary School District. There is no evidence that these annexations had any segregative purpose or effect.

The demographic developments since World War II have been such that most of the Spanish-surnamed persons live in the northern, downtown section of the district, and most of the Anglos live in the southern, suburban part of the district. Through no fault of the school authorities or any other state officials, at least as far as the record of this case demonstrates, one can now draw a line across the district, north of which the student population is 60.5% Spanish-surnamed, south of which only .07% is Spanish-surnamed. 612 F.2d at 413. This demographic reality, combined with the shape of the district, severely limits and complicates available remedies for segregation, unlike other cases, where the two populations are not separated by a number of attendance zones. *See, e.g., Adams v. United States,* 620 F.2d 1277, 1298–99 (8th Cir.),

*cert. denied,* 449 U.S. 826, 101 S.Ct. 88, 66 L.Ed.2d 29 (1980).

Finally, there is little or no dispute that the vast majority of schools in the SJUSD are racially imbalanced. While there was some reluctance shown by the defendants at trial to define racial imbalance by a certain percentage figure, the parties talked throughout the trial about those schools which were identified by the State of California under its guidelines as substantially imbalanced. That was defined as any school with a percentage of pupils of one or more ethnic groups which differed by more than 15 percentage points from the percentage of that racial or ethnic group in the total student population of the district. *See* 412 F.Supp. at 314. In 1968, the state identified 41 out of 50 schools in the SJUSD as racially imbalanced, and there is no doubt that this concentration continued and intensified right through the time of the trial of this case. *Id.* There is also no question that the district was well aware at least since 1964 that this substantial imbalance existed and was getting worse. *Id.* at 315–16.

### A. *Site Selection and School Construction*

As already noted, the selection of sites, along with the choice of sites to eliminate, is a crucial issue in this re-evaluation of the evidence. Not only is the selection of sites and the size of schools not dictated by a neighborhood school policy in and of itself, but these decisions can play a crucial role themselves in defining the nature and make-up of a neighborhood.

As we found in our earlier opinion, 412 F.Supp. at 316–17, since 1965 nine new schools have been sited and constructed in the San Jose Unified School District. All of these schools opened racially imbalanced. While the district failed to consider the state guidelines on evaluating attendance areas, the fact is that, absent a major reformation of the attendance patterns in the entire district and a complete abandonment of the concept of neighborhood schools, the

formal consideration of the state guidelines would have had no effect on the selection of sites and the construction of these schools.

Virtually all the increase in school age population over the past three decades has occurred in the southern section of the district. There has been a virtual explosion of new subdivisions in these essentially suburban areas, with many new families, often with children, moving in. The overwhelming majority of these people are Anglos.

There is nothing constitutionally suspect about building new schools where there is a rapid increase in school age population. While it is true that suspicions would be properly aroused if the district was closing schools that appeared to be becoming racially mixed and simultaneously opening new schools farthest from the area where the majority group resides, *Swann v. Charlotte-Mecklenburg Board of Education, supra,* 402 U.S. at 21, 91 S.Ct. at 1278–79, there is no evidence of such manipulation in this case. Rather, the district simply responded to the needs presented by the population growth. These new areas were so far from the downtown areas, and the new construction represented such a small percentage of the total facilities in the district, that the need for new schools did not present a very good opportunity by itself to help integrate the district. There is no suggestion in the record of such readily available alternatives to the construction of these new schools in the new areas of population growth that the failure to seize on those opportunities could be fairly characterized as demonstrating segregative intent.

### B. *The Field Act Schools*

Perhaps the most disturbing evidence facing the court concerns the decisions made surrounding the reconstruction of what are referred to as the "Field Act" schools. Sixteen schools were closed at the end of the 1971 school year because, under the Field Act, Cal.Ed.Code § 15451 *et seq.* and § 15501 *et seq.,* they were considered unsafe. *See* 412 F.Supp. at 317.[1] Most of

---

1. Although under state law the district still had a couple of years to replace the pre-Field Act

facilities, a major earthquake in the Los Angeles area in February of 1971 led the school

these schools were located in the downtown area of the district, and, of particular interest to our considerations, some of these schools were located towards the southern portion of the downtown area, close to attendance areas which had a greater proportion of Anglo students.

Perhaps the most disturbing decision which was made at that time was to rebuild on their old sites three schools, Washington, Gardner, and Wilson, despite a recommendation from the Westinghouse Learning Corporation[2] to do otherwise, and despite the objections of a member of the Board of Education (and its former President) Mrs. McCreath that such a decision would perpetuate segregation unnecessarily.

However, a number of pieces of evidence mitigate against an inference that this decision, as ill-advised as it might have been, was motivated by segregative intent. First, the principal pressure which resulted in this decision seems to have been exerted by the local committee of the Building Master Plan Task Group in the Washington-Gardner-Wilson area, which was concerned that it would lose its neighborhood schools.[3] Second, despite the specific recommendation concerning these schools from the Westinghouse Learning Corporation study, the study also made it clear that real progress towards integration of the San Jose Schools could only be made through the use of two-way bussing. The shifting of attendance lines, and thereby reshuffling a few students who lived near the center of the district, would not make much difference. Therefore, Dr. Charles Knight, the Superintendent of the SJUSD, testified that the district chose to follow a rebuilding program "that would not get in the way of a two-way exchange of students." Reporter's Transcript at 611. Third, the Board did, finally, move to transfer a section of the Washington attendance area, known as the Little Orchard section, to the River Glen attendance area. The Little Orchard area is almost 100% Spanish-surnamed Americans, and it is slightly closer to the River Glen than to the Washington school. There was some evidence at trial that the Board refused to make the transfer for a long time because of pressure from those already residing in the River Glen attendance area. The fact that the Board did voluntarily make the transfer, despite the resistance, can only help dispel any inference that the Board acted with a segregative purpose in mind. Finally, the Board ultimately decided not to rebuild the Wilson Junior High School, which was the most heavily segregated Junior High in the district.[4] Plaintiffs tried to argue that this

---

board to vote to close all pre-Field Act schools at the end of the school year and to establish a Building Master Plan Task Group for the purpose of planning and constructing new facilities for the students displaced by these closures by the fall of 1972.

**2.** The Westinghouse Learning Corporation was commissioned to make recommendations on ways to improve racial balance in the course of the major construction made necessary by the closure of the Field Act schools. This report was officially submitted to the Building Master Task Group, although the record indicated that the school board and other school officials were aware of the report's contents and recommendations.

**3.** When the Building Master Task Group was established, local committees were organized around each of the five High School Attendance areas. While there was evidence introduced that, in hindsight, some officials thought that this method of organization undermined the elements of the community favoring changes which would result in greater ethnic balance in the schools, there is no evidence to suggest that this was anything more than a strategic error; there is no evidence that the Task Group was organized in this manner for the purpose of undermining integration, nor is there any evidence in fact that anyone could have or did predict that this organizational decision would cause this result.

**4.** There is some evidence in the record that the Airport Land Use Commission would have moved to prevent the rebuilding of the Wilson school on the old site because it was in the flight path of the San Jose Municipal Airport. However, the question never went as far as formal condemnation hearings. *See* Reporter's Transcript at 1375–77. For further findings concerning the decision not to rebuild Wilson, see 412 F.Supp. at 321.

decision is evidence of segregative intent. The court, however, as discussed *infra,* p. ——, thinks this decision also serves to help dispel any inference of segregative intent arising from the school officials' other actions.

The school district also chose to house students in temporary portable classrooms on the sites of the Field Act schools while the buildings were being reconstructed, rather than make any attempt to disperse them to other schools in the district in a manner which might have improved racial balance. However, while a few schools in the district had some excess capacity, most schools were operating at or over capacity, or were operating so close to capacity that it would not have been practical to attempt to fit a few more students into the available slots. Certainly, to make those transfers and disrupt the attendance patterns of students—moving them out of their community, separating friends, throwing children into a new environment from which they will then be removed in a year or two—for just the interim period of construction does not appear to this court to be so compelling an option that an inference of segregative intent should be drawn from the failure to seize the opportunity.

The evidence did show a very few instances where the undercapacity of a heavily Anglo school was sufficient and the school was close enough to a heavily Spanish-surname school that a transfer could have been accomplished even within a concept of neighborhood schools. Those instances are few in number and there was no evidence that the school officials affirmatively considered and rejected these alterations in the attendance patterns. At best, the evidence indicates that the school officials did not make as great an effort as possible to identify and seize on every available instance where a transfer of students to a nearby school operating at slightly under capacity would have improved ethnic balance. Under these circumstances, and in the context of the rest of the evidence in this case, this court does not think it proper to infer from this failure to seize on opportunities to integrate proof of an intent to segregate.

## C. *School Closures*

School closures, like the selection of new schools, can play an important role in helping the courts identify a segregative purpose of a school district which claims to operate under a neutral neighborhood school policy. The decision to close certain schools and disperse their students to some schools and not others can provide evidence that the attendance areas of the neighborhood school policy were delineated in a manner designed to continue racial separation. *Taylor v. Board of Education of City School District of New Rochelle,* 191 F.Supp. 181, 195 (S.D.N.Y.), *affirmed,* 294 F.2d 36 (2d Cir.), *cert. denied,* 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961). This is the type of evidence with which the Ninth Circuit was particularly concerned in sending this case back to this court.

The evidence surrounding school closings in this case, however, considering all the circumstances, does not support a finding of segregative intent. Declining enrollment in the northern part of the district led to a couple of instances where schools were closed and the attendance area combined with contiguous areas. In each instance, the students of the closed school ended up in a new school which was less imbalanced than their old school. Since most of the schools in the northern area are imbalanced to begin with, the reciprocal effect of these consolidations was that the receiving school became more heavily imbalanced. The plaintiffs do not seem to dispute that, if the school district only considered consolidation with contiguous areas, it did the best job it could. However, plaintiffs contend that the failure to consider alternatives, such as bussing students to schools in the southern end of the district, provides evidence of segregative intent. Plaintiffs' counsel, in fact, repeatedly referred to the consolidation of attendance districts in the northern end of the district as the "downtown shuffle."

■ However, the court must look at this evidence while bearing in mind that it can-

not judge the district's actions against a duty to integrate the schools. *Johnson v. San Francisco Unified School District,* 500 F.2d 349, 351 (9th Cir. 1974); *Soria v. Oxnard School District Board of Trustees,* 488 F.2d 579, 587 (9th Cir. 1973), *cert. denied,* 416 U.S. 951, 94 S.Ct. 1961, 40 L.Ed.2d 301 (1974). While the decision to continue to draw attendance areas which were contiguous and which approximated as closely as possible the concept of a neighborhood school had the foreseeable effect of continuing the imbalance in the schools, the decision not to depart from the neighborhood school policy in order to bus students a great distance to the already overcrowded southern schools, on double sessions, cannot be attributed to segregative intent. The perfectly sound educational reasons for preserving a true neighborhood school policy, the district's desire to push forward with decentralization, and the fact that the district chose, in each instance, the redistribution of the students to contiguous areas resulting in the most beneficial effect in terms of racial balance for the students being reassigned, all counter any inference of segregative intent which might arise from the foreseeable effect of the refusal to bus. The result may have been continued segregation, but the court does not feel that the balance of evidence on this point suggests that the district acted with an unconstitutional purpose.

Nor is there any evidence that the choice of schools to close was motivated by any segregative intent. In fact, the decision to close the Wilson school and disperse its students to three neighboring schools seems to have been motivated, at least in part, by a desire to eliminate the most heavily segregated Junior High School. The change resulted in an improvement of the racial balance for all the former students of Wilson. Moreover, the transfer of some of those Wilson students to the Markham Junior High School resulted in a marked improvement in the racial balance of that school, which went from 7.2% Spanish-surnamed to 18.4% Spanish-surnamed. From the perspective of the other schools involved in the change, the already existing imbalance was made worse. But the school officials' willingness to make changes like these, which result in some mitigation of the segregation for some pupils, counters any inference arising from other evidence that the officials' actions were generally motivated by a discriminatory purpose.

Similarly, the decision to close the Bascom school was necessary, since the school was located on land belonging to the City College, which wanted the site back by 1973. The combination of that attendance area with Trace resulted in the best possible improvement in ethnic balance for the students from Bascom.

The Belden site was turned over to the continuing education high school for the perfectly rational reason that it was located in an industrial area and so was conveniently situated for programs involving on-site training. College Park was closed because of problems caused by the close proximity of the municipal airport, and Jefferson was closed as one of the unsafe, pre-Field Act schools. These schools were reasonably combined with the Bachrodt school, because 1) it had the largest site, 2) this area was historically served by one school before the population increase had forced the division of the area, and 3) College Park was separated from Hester by railroad tracks, which would have increased the need for transportation for safety reasons.

Longfellow and Roosevelt were also closed because they had been built prior to the Field Act and were considered unsafe. Neither school was rebuilt.[5] Both schools were heavily imbalanced technically. The students were reassigned to schools, Hester and Burnett (and San Jose High School, *see infra,* pp. 634–635), respectively, which resulted in an improvement of the racial balance from the perspective of the students who had formerly attended the closed school.

---

5. Longfellow was apparently not rebuilt because of the construction of a new highway at or near the site of the school. *See* Reporter's Transcript at 1375.

These choices, therefore, do not seem to support an inference of segregative intent. It is true that the district did decide against a major reformulation of the attendance patterns by instituting bussing to schools further south. In each of these instances of closing, there is no doubt that the possibility for instituting such a plan was brought to the school officials' attention by a group or individual. However, the refusal to abandon a neighborhood school policy, without more, in order to integrate cannot be the basis for inferring segregative intent; otherwise, we would in effect be imposing a duty to integrate on school districts whose segregation is attributable to residential segregation unrelated to the actions of school and other state officials. That we are forbidden to do. *See Brody-Jones v. Macchiarola*, 503 F.Supp. 1185, 1248 (E.D.N.Y.1979) (No duty to desegregate schools whose imbalance was caused by other factors, such as demographic trends, unrelated to actions of the school district); *see also infra,* pp. 642–644.

With the decision to close the Wilson and Roosevelt Junior High Schools permanently came a restructuring of the grades of the downtown junior high schools and high schools. Formerly, all junior high schools in the SJUSD were three year schools, and all high schools were also three year schools. However, the school board decided to restructure the schools so that the downtown junior high schools—Burnett and Hoover—became two year schools, and the downtown high schools—Lincoln and San Jose—became four year schools. The junior high schools and high schools in the rest of the district remained on the old 3–3 plan. *See* 412 F.Supp. at 321.

Two aspects of these changes resulting from the decision to close, and not rebuild, Wilson and Roosevelt are particularly disturbing. First, the restructuring decisions resulted in two different feeder systems, one for the area which was predominantly Spanish-surnamed, and one for the area which was predominantly Anglo. Certainly, the use of different feeder patterns for schools dominated by different racial or ethnic groups could form the basis for a finding of segregative intent, for it could provide evidence that feeder patterns were being manipulated for the purpose of channeling the two groups into different high schools. *See, e. g., Morgan v. Kerrigan*, 509 F.2d 580 (1st Cir. 1974), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). Second, the transfer of students resulted in Hoover Junior High School transforming from one of the district's few racially balanced schools to an imbalanced school. *See* 412 F.Supp. at 321–22.

However, unlike the evidence of the manipulation of the feeder patterns in *Morgan v. Kerrigan, supra*, these changes do not appear to this court to be designed to channel racial or ethnic groups apart. As already noted, the changes resulted in a better ethnic balance from the point of view of the students being transferred from the closed schools. Moreover, part of these series of changes included the transfer of some students to the Markham Junior High School, which made that school racially balanced. Finally, the changes in structure are not part of a pattern of manipulations and affirmative actions which could only be explained, *in toto*, as motivated by segregative intent. The court is convinced, on the basis of all the evidence, that this restructuring was simply the only alternative that the school officials saw to a major restructuring of the attendance patterns of the district. These changes allowed them to preserve the concept of neighborhood schools, which is not in and of itself constitutionally suspect. *See infra.,* pp. 642–644. And since the evidence does not unambiguously point towards a further separation of the ethnic groups, but rather shows, from some perspectives and for some students, an improvement in the racial balance of the schools they attended, the court is not prepared to find that any inference of discriminatory purpose which might arise from this one differentiation in the feeder patterns of the northern and southern schools and from the resulting imbalance at the Hoover school rises to the level of proof of segregative intent, either by itself or combined with the rest of the evidence in

this case. Too many pieces of evidence point the other way for this court to draw that conclusion from those which point towards such an inference.

### D. *Portables and Double Sessions*

As our earlier decision noted, 412 F.Supp. at 322–23, the school district uses portables extensively throughout the district. A number of schools in the north were, at the time of trial, made up exclusively of portable classrooms; portables were used to construct schools on the sites of Field Act schools after the old buildings were condemned and while new buildings were being constructed. In the south, the rapidly growing population forced the extensive use of portables to relieve overcrowding until new facilities could be built. (The problem in the southern end of the district was, of course, exacerbated by the repeated failure of bond issues on the ballot during the years from 1969 right up through the time of the trial on this matter, which prevented needed construction of new schools.) Moreover, testimony at trial indicated that the Board of Trustees of SJUSD, in planning a new school, builds the school with a capacity under the estimated maximum number of students who will be using the facility during its lifetime, in order to avoid having a great deal of excess space when enrollment is below peak. Therefore, the need for the use of some portables—at the time of peak enrollment—is automatically planned into construction decisions.

█ It is true, as noted in our initial decision, 412 F.Supp. at 322, that the school district has never used portables to increase integration. This, of course, was always an alternative available when a need for portables arose; the school district could always have opted to place new portables at the other end of the district from the area of overcrowding, and then bus the students to that end of town. But to suggest that the failure to take that extreme action indicates segregative intent seems unreasonable to this court. Because the need for portables at a particular location at either end of town was considered temporary—in the north until the new Field Act schools were constructed, in the south until bond issues were passed by the voters to build new schools to handle the growth in population—any integration based on the use of portables would be temporary at best. Moreover, courts have acknowledged that efforts to maintain the concept of neighborhood schools is a perfectly reasonable educational choice, as long as it does not operate as a mask for a desire to maintain segregation. *United States v. Texas Education Agency*, 564 F.2d 162, 168–70 (5th Cir. 1977), *cert. denied sub nom., Austin Independent School District v. United States*, 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979); *Smiley v. Vollert*, 453 F.Supp. 463, 481 (S.D.Tex.1978); *see infra.*, pp. 642–644. In this instance, the decision to maintain neighborhood schools while new schools were being built, rather than sending the students temporarily across town, for distances which would have to be, for the most part, fairly substantial, seems to this court to be perfectly explicable for racially neutral reasons, and does not provide sufficient grounds for inferring proof of segregative intent.

█ The continued use of double sessions is more troubling, because it is acknowledged that double sessions are educationally disadvantageous. Therefore, the fact that bussing students a long distance is also considered by many to be educationally disadvantageous carries less weight as an explanation when the alternative is also so considered.

However, the evidence does not, on balance, indicate that the problem of double sessions could have been alleviated to any great extent by bussing students from the southern to the northern schools. While some of the northern schools were operating at undercapacity, for the most part they were not operating very far under capacity, and few students could have been transferred without causing the northern schools to go also on double sessions. Moreover, some of the figures concerning undercapacity masked the reality that all the available space was being utilized in the northern

schools. For instance, there was testimony at trial from Dr. Knight that the compensatory education programs which were available for students in many of the downtown schools provided for lower student-to-teacher ratios and also provided for additional support personnel, who needed to use some of the space for their work. Reporter's Transcript at 1338–39.

Again, the need for double sessions was perceived by school officials to be a temporary situation, until new schools could be built. These new schools would be built where the students lived, in line with the neighborhood school policy. Therefore, any alleviation of segregation which would come from sending the students to northern schools would have been temporary. It would have resulted, moreover, in simply spreading the double session problem throughout the district, thereby increasing the number of students adversely affected by this unfortunate situation. Under these circumstances, the decision not to bus the students already on double session to northern schools, while clearly having the foreseeable effect of bypassing another opportunity to increase integration, at least temporarily, does not provide a basis for inferring proof of segregative intent from the actions of the school officials.

E. *Transportation*

■ The court's basic findings and conclusions on this issue remain virtually the same from those made in its initial decision. *See* 412 F.Supp. at 324, 332. There was evidence introduced at trial that there is a great deal of bussing used in the SJUSD, both in terms of the number of students being transported (approximately one-third of the student population) and in terms of the money expended (over $850,000 per year). However, except for transportation to special schools and programs, there was no evidence that there is or has ever been any bussing outside of the attendance areas, which have not been shown to have been established or gerrymandered in any way that suggests segregative intent. Nor

was there any evidence introduced showing that students could have been bussed equivalent distances to a more integrative setting.

The school officials readily admitted that bussing was necessary even within the neighborhood school concept. Besides the obvious need for transportation over relatively short distances for safety reasons, and the need for transportation of students who attend special schools, the natural fluctuations in the concentration of school age population in one area or another will always necessitate some deviation from the ideal of students always living within walking distance of their schools. Particularly when the school age population is relatively sparse, the necessity that schools be at least a certain size in order to justify needed facilities and programs means that attendance areas must, at times, be so large that some, even a great number of students, will have to be transported to the school.

There is no evidence in the record, however, suggesting that the school officials in the SJUSD did not strive for the best approximation of the "walking distance" ideal, or that they manipulated the use of bussing in one area or another for discriminatory purposes. The bussing in the south was readily attributable to the larger attendance areas which existed as the population there first began to move in, and was unfortunately prolonged by the repeated failure of the school district to receive the authorization from the voters to build more schools. These would have presumably eliminated a great deal of the bussing in the southern part of the district. In the north, the principal bussing was attributable to the consolidation of districts as the need for some schools had been eliminated. Nor was there any evidence offered which suggested that the distances from school ever became so great that the underlying benefits deriving from a neighborhood school policy and the decentralization it allows—other than the ability to walk to school—were ever threatened or eliminated.

The visuals attached to the affidavit of Roy B. Bursch, filed December 17, 1971,[6] provide a good representation of how changes in population allow for the shrinking of attendance areas and the elimination of the need for transportation. Visual number three in particular shows how the growth in population in the downtown area during the 1950s allowed the College Park-Jefferson-Grant attendance areas to be subdivided. In more recent years, the reversal of that population trend has reversed the trend in schools, so that much of that population is now once again served by one school, Bachrodt, which covers a large area and therefore necessitates the use of buses to transport students. The response to these trends by the school district has been neutral and even-handed, and there has been no evidence introduced which suggests that any actions in this area have been motivated by segregative intent. Absent evidence that similar amounts and distances of transportation could have been used to alleviate racial imbalance, the court sees no basis for inferring segregative intent from the use of bussing by the school district within the context of the neighborhood school policy.

■ One other aspect of the transportation issue leaps out at anyone examining the record in this matter. As noted in our earlier opinion, 412 F.Supp. at 324, the evidence indicates that Dr. Knight, the Westinghouse Learning Corporation, and the Building Task Force all concluded that the only realistic solution to the segregation in the SJUSD would be some form of two-way bussing. There is evidence that the Board of Trustees and all other school officials recognized that, ultimately, the school district could not be integrated without bussing. Yet the Board has repeatedly made it clear that it is opposed to bussing for the purpose of integration. Plaintiffs' counsel, at the trial, repeatedly returned to this argument and ultimately appeared to consider this evidence the most compelling of their case: in the face of the knowledge that the SJUSD would be desegregated only with some form of two-way bussing, the Board of Trustees consistently refused to consider any proposal for bussing and repeatedly went on record as publicly opposed to large-scale bussing for the purpose of integration.

It may well be that the Board hoped that some other solution to the problem of integration could be found, short of large-scale bussing, which it properly recognized would meet resistance from the community, both Anglo and Spanish-surnamed. There is also some evidence that the Board, in its various pronouncements throughout the years, did not mean to rule out the possibility of some bussing in connection with a plan for integration. Rather, the statements suggest that the Board promised the community that there would not be any change in the traditional methods of school assignments without plenty of notice to the community and plenty of opportunity for input into the process by citizens of the SJUSD.

Nonetheless, this apparent resistance to bussing is particularly disturbing in light of the Board's refusal to institute other suggestions throughout the years which would have had some effect on the pattern of racial imbalance. Suggestions for magnet schools, education parks, open enrollment, and voluntary bussing have received, at best, cursory consideration from the school board. In each instance, however, there were perfectly reasonable and rational explanations for the decision not to adopt the proposal.

Accordingly, on this record the court does not see sufficient evidence to justify a finding of segregative intent simply from the refusal of the school officials to adopt any

---

**6.** A similar set of visuals were introduced by the defendants in the trial on the merits, identified as defendants' Exhibit H. Upon return of the materials in this case to this court from the Court of Appeals, however, those visuals were missing. Neither plaintiffs nor defendants were aware of their location, nor could they provide duplicates. The court, however, is certain that the visual referred to, which was introduced at the preliminary injunction stage of the proceedings, accurately depicts the changes which were also shown in the aforementioned Exhibit H.

of the proffered alternatives, including bussing, to the neighborhood school policy. The incidents are relatively few in number, there are reasonable explanations, other than segregative purpose, for them, and there are other actions and statements by the Board which show some concern with and attempts to alleviate segregation. While the district has clearly gotten cold feet on a number of occasions and has failed to follow through on its claimed goal of desegregating the district, it is, of course, under no constitutional duty to do so. The court is convinced that the desire often expressed is real, even if there has been some reluctance in the execution. This evaluation, combined with those actions which have helped, to some small degree, to alleviate some of the worst imbalances, convinces this court that the foreseeable maintenance of segregation which resulted from other actions and refusals to act by the school board does not support, in this instance, an inference of segregative purpose. The refusal to date to consider bussing, despite a recognition that it is probably the only solution to the problem of racial imbalance in the SJUSD, is the most damning of the evidence against the school district, but it is not sufficient, in the context of the rest of the evidence in this case, to support a finding of liability.

### F. Bond Issue Elections

The major point concerning the bond elections which plaintiffs pressed at trial and our initial findings highlighted, 412 F.Supp. at 324–25, is that various public comments by the school board in connection with the effort to get the growth issues passed in the years 1971 through 1973 offered 1) the carrot that the bond money would not be used to subsidize bussing (and reiterated the Board's own continued disinclination to use bussing for integration purposes) and 2) the stick that failure to pass the bond issue would result in (a) alterations in the neighborhood school policy to spread double sessions throughout the district and (b) the need to send students from the northern end of the district to the south, and/or vice versa. It is of course interesting to note that despite these so-called threats and promises made in connection with the bond elections, allegedly designed to appeal to people's segregative inclinations, none of the bond issues in connection with which these statements were made were passed by the voters.

██ One factual finding made in our initial decision, 412 F.Supp. at 332, needs to be clarified. The bond issue passed in 1969 for the rebuilding of the Field Act schools contained a provision which stated that the funds raised by the bonds would not be used to purchase new sites. However, it did not, in fact, require that the schools be built on the same sites: old sites could be sold and the proceeds used to purchase a new site. Presumably, in fact, funds raised by such a sale could also be supplemented by money from other sources to pay for the purchase of a new site. Building the Field Act schools in different locations might have been made more difficult by this provision in the bond issue, but it did not require that the same sites be used. Therefore, there is little basis for drawing any inference of segregative intent from the wording of the bond issue, since it did not close the door to the reconsideration of the location of the Field Act schools. Moreover, as the court stated in the first decision, 412 F.Supp. at 332, since we find that the actual decision to rebuild most of the Field Act schools on site does not support a finding of segregative intent in the context of the other evidence in this case, this language in the bond issue, which did not even require that the schools be built on site, does not provide any stronger basis for an inference of segregative intent.

The court also reiterates its earlier findings, 412 F.Supp. at 332, concerning the Board's statements issued in connection with the bond issue campaigns. The court has re-examined those materials carefully. The statements concerning the spread of double sessions and the need to transport students to the other end of the district if the various issues did not pass seem, in context, to be simply realistic factual statements of the results which would flow from

the failure of the bond issues to pass. These statements are just some, among others, made in the literature concerning the possible repercussions of the failure of the bond issues. There is no particular emphasis given to them, nor, in context, is there any suggestion that the school board meant to do anything but point to the many burdens which would be placed on the students and the district in general by such a failure of the bond issue to pass.

The repeated assurances that the bond money would not be used to finance bussing also fail, in this court's judgment, to support a finding of segregative intent. If the school district ultimately decided to adopt some sort of bussing plan, there was no evidence that the funds from these bond issues would be needed to finance such a plan. Certainly if there is no affirmative constitutional obligation to integrate, there is no such obligation to bus to integrate. And there is even more certainly no constitutional infirmity in promising not to use particular funds for that purpose. If that is the case, it would seem highly improper to put much weight on the fact that the district made such a promise in this instance. Again, in a stronger case, such a promise might add secondary support for a finding of unconstitutional intent based on conduct from which such an inference could be more confidently drawn. In the context of this case, where the rest of the evidence of the district's actions, in the context in which they occurred, do not provide a strong basis for an inference of discriminatory purpose, the fact that it promised not to use these particular funds for bussing does not add much weight in favor of that inference.

### G. *Quest*

As the findings in our initial decision stated, 412 F.Supp. at 325, the school board established QUEST (Quality Urban Education Study Team) in 1969 to formulate proposals to desegregate the schools of the SJUSD. While the Board did not ultimately adopt any of QUEST's proposals, our initial findings concerning the school board's relationship with QUEST requires further elaboration. For instance, there is evidence on the record that the Board itself did issue statements indicating that it did not favor mass bussing, and there are some indications that school officials encouraged QUEST not to make any proposals which might be inflammatory immediately prior to the bond elections. However, prior to the "opening up" of the QUEST membership, there is no evidence that the Board attempted to direct the findings of QUEST or to otherwise interfere with its operations. To the contrary, the evidence indicates that school officials did their utmost to ensure, when QUEST was organized and began its work, that articulate, concerned representatives of all segments of the community were involved, and to ensure that those involved in QUEST desired to develop proposals to integrate the school system, not to sabotage the effort. This evidence helps, in fact, to counter other evidence from other actions which might raise an inference that the Board acted with segregative intent.

Under pressure from members of the community who feared the outcome of QUEST's work, the Board did agree to open up QUEST to more people, and did so at a meeting attended mostly by people opposed to the work of QUEST. However, the evidence also indicates that the Board made subsequent efforts to recruit more people from other, more supportive segments of the community to join in the effort and to presumably counter-balance the influx of people hostile to QUEST's mission. Even the former chairman of QUEST testified that he favored the general notion of opening up QUEST to a broader membership, but objected to the manner in which the Board did it and the circumstances in which it acted. The Board's action did result in a disruption and delay of the work of QUEST, as the new people were integrated into the work of the various subcommittees (which also had to be expanded in number to accommodate all the new people) and were educated in the previous work of QUEST. It must be noted, however, that despite the time and manner in which the

membership of QUEST was re-opened, the final report of the reconstituted QUEST did recommend a plan for integrating the schools, which included the use of magnet schools, open enrollment, and voluntary bussing. The minority report also recommended integration, through the use of educational parks.

While the Board does seem to have, at certain points, succumbed to pressure from persons hostile to the work of QUEST, the overall picture presented suggests that the Board's initial organization of QUEST, and the efforts both then and at the later point of reconstitution to ensure that the community was well represented and that persons sympathetic to the work of QUEST were in the positions of leadership in both the original and reconstituted organization, does not support an inference of discriminatory purpose in the Board's relationship to QUEST. And while the Board did modify its charge to QUEST, down-grading integration from the "primary objective" to a "long term . . . priority," the court does not see this essentially political move as particularly decisive, either for the work of QUEST or for the likelihood of integration or continued segregation in the SJUSD. Under these circumstances, this example of the Board's concession to those hostile to the work of QUEST does not support a finding of segregative intent.

Indeed, the Board's persistence in seeing the work of QUEST go forward, in attempting to protect it from being overwhelmed by those hostile to its work, and in continuing, despite pressure, to encourage QUEST to formulate proposals for the integration of the district—even if for the long term—seems to the court to support a finding that the Board was trying its best, in a difficult situation, to continue to move forward towards some affirmative effort to integrate. The fact that it seems to have not followed through ultimately on that effort, by not acting on QUEST's proposals, may mean that it has abandoned this affirmative effort to integrate. But its efforts certainly do not, therefore, become the basis for inferring an intent to segregate. To make such an inference would be to warn all school districts which have racially imbalanced schools not to make any affirmative moves towards integration unless they are certain that they will succeed; otherwise, the effort will become the basis for an inference of discriminatory purpose on their part, rather than an inference of the very opposite intent which in fact motivated them. Not only would this be the wrong position for the courts to take as a matter of policy but, as long as there is a distinction in the law between *de facto* and *de jure* segregation, such an approach would seem altogether improper.

### H. *Faculty and Staff Assignment*

 Under the law, school districts may not assign staff and faculty to certain schools on the basis of race or ethnicity. *See United States v. Montgomery County Board of Education,* 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969), and other cases cited for this point in our initial opinion, 412 F.Supp. at 333. A discriminatory pattern of assignment of faculty and staff "[is] among the most important indicia of a segregated school system." *Swann v. Charlotte-Mecklenburg Board of Education, supra,* 402 U.S. at 18, 91 S.Ct. at 1277; *Adams v. United States, supra,* 620 F.2d at 1290; *Arthur v. Nyquist,* 573 F.2d 134, 144 (2d Cir. 1978); *United States v. State of Texas,* 498 F.Supp. 1356, 1372 (E.D.Tex.1980). The courts have made it clear that benign motivations behind the decision to assign faculty and staff on the basis of race does not mitigate the fact that the assignment has been made on an unconstitutional basis.

 Officials of the school system admitted at trial that Spanish-surnamed teachers were assigned to predominantly Spanish-surname schools for educational purposes. These purposes basically amounted to providing role models for the students and making available Spanish-speaking teachers. As noted, the court does not believe that the law allows assignment on the basis of race even if motivated by the former purpose. The court believes that the latter purpose might have been

proper if there was evidence that the district simply attempted to assign Spanish-speaking faculty and staff to schools with a high percentage of Spanish-speaking students and that such a policy resulted naturally in the assignment of a disproportionate number of Spanish-surnamed teachers and staff to schools with a disproportionate number of Spanish-surnamed students. As our initial findings of fact reflected, 412 F.Supp. at 333, however, there was no evidence introduced showing that the district investigated the need for Spanish-speaking teachers at those schools, or made any attempt to identify teachers or staff who spoke Spanish—who were either Anglo or Spanish-surnamed—for the purpose of assigning them to those schools. Therefore, the court cannot conclude that the disproportionate assignment of Spanish-surnamed teachers and staff to those schools resulted from that racially neutral policy.

However, this court is concerned, in the context of this suit, only with any effect that this assignment policy had on the segregation of the student population of the schools. Such an effect could result from the racial identifiability of the school caused, at least in part, by the make-up of the faculty and staff. *Adams v. United States, supra,* 620 F.2d at 1290. Despite the grossly disproportionate percentages of Spanish-surnamed faculty and staff assigned to predominately Spanish-surname schools, *see* 412 F.Supp. at 325, the small number of Spanish-surnamed teachers and staff in the SJUSD means that no school has a large percentage of Spanish-surnamed faculty and staff. As this court previously found, *id.,* one school had a faculty that reached 26 percent Spanish-surnamed at one time, and another had a 24 percent Spanish-surnamed faculty. Otherwise, the percentage remained below 15 percent in any one school. These percentages are too low, in the court's opinion, to cause a school to have become ethnically identifiable because of the policy of assignment of faculty and staff. Whatever the discriminatory nature of the assignment policy, therefore, this court sees no basis for concluding that the assignment policy affected the racial imbalance of the student population of the schools. Moreover, the benign purposes which lay behind the district's policy does convince the court that we should not use the assignment policy as support for inferring segregative intent from any of the school officials' other acts which had the foreseeable effect of perpetuating racial imbalance in the schools.

I. *Board Policy and State Statutory Requirements*

The court stands by its earlier findings and conclusions as to the Board's policy and the state statutory requirements vis-a-vis integration, 412 F.Supp. at 326–28, 333–34, and we will simply elaborate on those findings and conclusions. The court feels that the Board's oft-repeated commitment to integration can only weigh in the district's favor and against an inference of segregative intent. The repeated statement of this policy does, of course, make it undoubtedly clear that the school officials were well aware of the continuing existence of severe ethnic imbalance in their schools; but even without those statements, there is no way that the Board of Trustees and all other high officials of the school district could not have been well aware of the situation. And it is true that the Board ultimately did little to implement its stated commitment to integration. But under the circumstances of this case, where there never was an affirmative duty to integrate, the fact that the Board was repeatedly willing to commit itself on paper to looking for a solution to the problem of imbalance should not be turned on its head and used to support an inference of segregative intent. If the actions taken by the Board do not themselves form the basis for such a finding, the court does not see how the Board's willingness to state openly that its object and purpose is to promote integration provides the missing foundation for such an inference. The Board should at least be given credit for its willingness to stick by this position, even if just rhetorically, despite the apparent opposition among many residents of the district to any such effort. At worst, the state-

ments carry no weight one way or the other. The court, however, feels they are worth something more than that. The statements, combined with the persistent attempts to encourage the development of some proposal which would increase ethnic balance in the district's schools, however limited and however often the Board ultimately failed to follow through on the resulting proposals, do help, to some degree, to offset some of the other evidence which, it could be argued, suggests an inference of segregative intent.

As to the effects of the existing state policies, statutes and guidelines, it is important to keep in mind that this action does not include any pendant state claims or any direct allegations of violation of state law. The record repeatedly reflects that fact that the plaintiffs raised the arguments concerning state law only in so far as the alleged failure to follow the guidelines and policies might support an inference of segregative intent under the standards of federal law.

■ In this context, the court reiterates the key findings on this issue made in its earlier opinion, 412 F.Supp. at 327–28, 334. While the state generally had some policy to encourage efforts to integrate imbalanced schools from 1962 until 1972, the specifics of that policy and the extent of the district's obligations did vary a great deal over that period. Therefore there is no basis for inferring segregative intent from the Board's failure to act in any specific manner. It is true that the Board responded to the state's continuing exhortations to integrate with references to the opportunity provided by the rebuilding of the Field Act schools and to the effort represented by the formation of QUEST, neither of which the Board in the end took advantage of to make much progress toward integration. Nor did the district take advantage of resources, such as those provided by the state's Bureau of Intergroup Relations, which would have assisted with the process of integration.

But again, these facts must be looked at in the context of the duty under federal law, which is the duty not to act with segregative intent. The court has herein found that the district's various substantive decisions do not support, in the context of all the evidence in this case, an overall conclusion that the school officials operated with an intent to segregate. We have also held that the district's failure to follow through on the few efforts it began towards finding a solution to the problem of ethnic imbalance in its schools does not support an inference of segregative intent; rather, to some extent they help mitigate evidence supporting an inference of segregative intent. The court likewise does not see how the district's failed attempts to comply with state policy and guidelines support such an inference. Again, those few attempts should be weighed in the district's favor; the fact that it ultimately did not actually decrease the imbalance in its schools during this period does not change the fact that the attempts provide evidence in the defendants' favor on the question of their intentions and purposes, especially given that under federal law there is no duty to integrate, simply a duty not to segregate purposely.

## J. Neighborhood School Policy

■ On remand, the examination of the SJUSD's neighborhood school policy remains central to the issues faced by this court. The Ninth Circuit stated that the invocation of a neighborhood school policy is not a defense, in and of itself, to a series of factual conclusions which support an inference of segregative intent. 612 F.2d at 415. The issue to be decided by this court, after looking at all the facts on the record, is whether or not it is proper to make an inference that segregative intent lay behind the actions of the Board of Trustees of the SJUSD when it took the various actions which knowingly perpetuated ethnic imbalance in the schools. But this issue cannot be decided without an evaluation of the district's neighborhood school policy, for most of the decisions made by the Board were explained in this action by reference to the neighborhood school policy. Much of

the ultimate conclusion of this court on the question of segregative intent must be based on an evaluation of the role played by this policy, the motivations behind the district's adherence to it, and the propriety under the law of the district's staunch reliance on it to justify its actions.

This court's finding that the facts in this case do not support an inference of segregative intent, therefore, is based in large part on its conclusion that the neighborhood school policy was developed and has continued to be embraced by the district's officials because of a sincere belief in its beneficial effects on the educational process and not in order to use such a policy to perpetuate segregation. The racial imbalance in the schools is a result of residential and demographic changes. There is no evidence in this case of gerrymandering of attendance areas, use of optional attendance zones, transporting of students across contiguous attendance areas, and other actions which in other cases have put the lie to the assertion of a neutral neighborhood school policy. Nor is there any evidence in this case that, despite the existence of a consistently and neutrally applied neighborhood school policy, an inference of segregative intent should be drawn from the SJUSD's selection of sites, the closure or abandonment of schools, or the assignment of faculty and staff. *Arthur v. Nyquist, supra,* 573 F.2d at 144–45; *N.A.A.C.P. v. Lansing Board of Education,* 559 F.2d 1042, 1049–57 (6th Cir.), *cert. denied,* 434 U.S. 997, 98 S.Ct. 635, 54 L.Ed.2d 491 (1977); *United States v. Texas Education Agency, supra,* 564 F.2d at 169–70; *Armstrong v. O'Connell,* 451 F.Supp. 817, 829–30 (E.D.Mich.1978); *Berry v. School District of Benton Harbor,* 442 F.Supp. 1280, 1325–26 (W.D.Mich.1977). Moreover, the evidence does not suggest that the past acts of the school board have contributed significantly to the residential segregation of the attendance areas. If such had been the case, there might have been grounds for holding that the present assertion of a neighborhood school policy was designed to perpetuate segregated schools. *Taylor v. Board of Education of City School District of City of New Ro-*

*chelle, supra,* 191 F.Supp. at 195–96. *See also* the discussion and cases cited in our initial opinion, 412 F.Supp. at 334–35. Finally, there was no evidence introduced in this case which supports a finding that other actions by state officials caused or contributed to the segregation in the residential patterns of the SJUSD which, combined with the elongated shape of the district, results in the racial imbalance of schools organized along neighborhood lines.

Under these circumstances, there is no reason to condemn the school district for its decision to stick with the concept of neighborhood schools. *Smiley v. Vollert, supra,* 453 F.Supp. at 481. As the Supreme Court wrote in *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 413, 97 S.Ct. 2766, 2772, 53 L.Ed.2d 851 (1977), "The finding that the pupil population in the various . . . schools is not homogeneous, standing by itself, is not a violation of the Fourteenth Amendment in the absence of a showing that this condition resulted from intentionally segregative actions on the part of the Board. *Washington v. Davis,* 426 U.S. 229, 239 [96 S.Ct. 2040, 2047, 48 L.Ed.2d 597] . . . ." Without any evidence of manipulation or bad faith in the adoption and maintenance of a neighborhood school policy, the courts have consistently recognized the reasonableness of the choice by educators and administrators in favor of neighborhood schools. *Brody-Jones v. Macchiarola, supra,* 503 F.Supp. at 1247; *United States v. Texas Education Agency, supra,* 564 F.2d at 168 n.9; *Deal v. Cincinnati Board of Education,* 369 F.2d 55, 60 (6th Cir. 1966), *cert. denied,* 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967). This choice seems particularly reasonable in light of the evidence in the record that the SJUSD wished to move towards more decentralization of school administration and governance.

The court is mindful of the Ninth Circuit's admonition that "we do not believe that a neighborhood school policy, no matter how consistently followed, can be a determinative fact in proving the ultimate fact of forbidden purpose." 612 F.2d at

415.[7] However, in deciding the ultimate question of segregative intent, this court's evaluation of the basis upon which such a policy was developed and maintained will greatly effect the weight given the district's reliance on such a policy. In this case, it is the court's conclusion, after weighing all the evidence, that the adherence to a neighborhood school policy by the school officials in the SJUSD was not a device for maintenance of segregative schools, although that effect was clearly foreseeable and was clearly foreseen by the school officials. Moreover, this good faith belief in the advantages of a neighborhood school policy means that the court does not infer the necessary segregative intent from the various instances where the school officials chose the alternative which preserved the neighborhood school concept, rather than adopt another alternative which would have required the abandonment of that policy. This evaluation of the role played by the neighborhood school policy in the decisions made by the school officials is not only proper, but absolutely necessary to the reaching of a proper conclusion by this court on the issue of segregative intent.

This conclusion concerning the neighborhood school policy, along with the court's evaluation of the other decisions by the district which were only collaterally affected by the policy, or which were not affected at all by reference to that policy, leads this court to its finding that the evidence does not support an inference of the necessary intent to segregate such as would necessitate a finding of liability. *See Personnel Administrator of Massachusetts v. Feeney, supra,* 442 U.S. at 279, 99 S.Ct. at 2296; *Washington v. Davis, supra,* 426 U.S. at 239–42, 96 S.Ct. at 2047–49.

## VI CONCLUSION

In conclusion, the court wishes to emphasize an important point made in its earlier decision, 412 F.Supp. at 335–36. This court would be extremely disturbed and saddened if its decision in this case was interpreted by either of the parties to this action or the public as encouragement to the Board to lie back and accept the consequences of the imbalance. Continued failure to choose the path which leads towards less ethnic imbalance in the schools could well, at some future time, form the basis for a conclusion that the school officials do, in fact, wish to keep the Anglos and the Spanish-surnamed students segregated in the SJUSD. So, it should be clear that the Board of Trustees takes a precarious path if it thinks it can continue forever to walk the thin line between a duty to integrate, which does not exist under federal constitutional principles, and the continuing obligation not to segregate intentionally, which would open the district to liability under federal law.

Accordingly, this court orders that judgment be entered in this case in favor of the defendants.

SO ORDERED.