Arnulfo M. DIAZ and Socorro Diaz, as the parents and next friends of Fernando Diaz, Miguel A. Diaz and Juan F. Diaz; Jose Vasquez, as the parent and next friend of David Vasquez, individually and on behalf of all other persons similarly situated, Plaintiffs-Appellants,

v.

SAN JOSE UNIFIED SCHOOL DISTRICT, Charles Knight, individually and as District Superintendent of the San Jose Unified School District; Neil H. Geier, Jr., Elizabeth J. Allen, Edwin P. Jones, Jr., Mary K. McCreath, and Donald L. Raimondi, individually and as members of the Board of Education of the San Jose Unified School District, Defendants-Appellees.

No. 81–4434.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted August 11, 1982.

Decided May 10, 1983.

Michael di Leonardo, Sunnyvale, Cal., for defendants-appellees.

Stephen Kociol, Cynthia L. Rice, San Jose, Cal., for plaintiffs-appellants.

**1130**

Before KASHIWA,* ANDERSON, and FARRIS, Circuit Judges.

J. BLAINE ANDERSON, Circuit Judge:

Plaintiffs, parents of Spanish-surnamed children attending public school in the San Jose Unified School District, filed this class action on behalf of themselves and all other parents of children similarly situated. The complaint charged that defendants were operating a segregated public school system in violation of the Fourteenth Amendment, and sought desegregation of the school district. The district court found that the school district was racially imbalanced and that the imbalance had been maintained by defendants. No liability attached, however, because the court decided defendants acted without segregative intent. *Diaz v. San Jose Unified School District,* 412 F.Supp. 310 (N.D.Cal.1976).

In a previous appeal, this court reversed and remanded for further proceedings, reasoning that the district court's decision suggested the school district's racially-neutral neighborhood school policy "constituted either a complete defense to the charge of segregative intent, or, completely dispelled the inferences of segregative intent that flowed from the [plaintiffs'] proof." *Diaz v. San Jose Unified School District,* 612 F.2d 411, 415 (9th Cir.1979). We went on to hold that, in light of *Columbus Board of Education v. Penick,* 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979), and *Dayton Board of Education v. Brinkman,* 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979), defendants' neighborhood school policy could not be determinative of the lack of segregative intent, but rather was "merely relevant evidence to be taken into account in deciding whether the forbidden intent did or did not exist." *Id.* With the caveat that we were expressing no opinion on the relative weight of the evidence, *id.* at 416 n. 2, this court reversed and remanded for further proceedings in light of *Columbus, Dayton,* and the principles espoused in our opinion. *Id.* at 416.

On remand, the district court analyzed *Columbus* and *Dayton,* this court's opinion, and three subsequent Supreme Court decisions, and carefully reconsidered the evidence in light thereof. *Diaz v. San Jose Unified School District,* 518 F.Supp. 622 (N.D.Cal.1981). Once again, the court found insufficient evidence to support a finding of segregative intent. Because the district court's factual findings were not clearly erroneous and because the proper legal principles were correctly applied to the facts, we affirm.

## I.  THE DISTRICT COURT'S FINDINGS

To avoid repeating the fact statements in the three prior reported opinions, only a very brief summary of the facts is presented here. The parties have always agreed that because no statutory dual system of schools has ever existed, plaintiffs "must prove not only that segregated schooling exists but also that it was brought about or maintained by intentional state action." *Keyes v. School District No. 1,* 413 U.S. 189, 198, 93 S.Ct. 2686, 2692, 37 L.Ed.2d 548, 557 (1973). *Accord Washington v. Davis,* 426 U.S. 229, 238–48, 96 S.Ct. 2040, 2046–52, 48 L.Ed.2d 597, 606–612 (1976). It is undisputed that since at least 1962, defendants have known the school district was racially imbalanced and since approximately 1965, defendants have implemented a series of policy decisions whose cumulative effect has been to maintain the imbalance. Those decisions involve (1) site selection and school construction; (2) adoption of a neighborhood school policy with board-designated attendance areas; (3) reconstruction of Field Act Schools; (4) school closures and student reassignments; (5) location of portable classrooms and maintenance of double sessions; (6) student transportation; (7) presentation of materials supporting bond elections; (8) response to integration proposals by citizens' committee; (9) faculty and staff assignments; and (10) failure to

* The Honorable Shiro Kashiwa, Circuit Judge, United States Court of Appeals for the Federal Circuit, sitting by designation.

integrate despite a state statutory duty and a publicly-issued board policy to relieve ethnic imbalance. 412 F.Supp. at 315.

What is disputed is the existence of segregative intent, a factual matter to be reviewed for "clear error." *Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982); *Dayton Board of Education v. Brinkman,* 443 U.S. 526, 534, 99 S.Ct. 2971, 2977, 61 L.Ed.2d 720, 731 (1979). In an effort to prove segregative intent, plaintiffs' approach throughout this litigation has been to focus on the foregoing policy decisions in an attempt to establish that each was supported by little or no educational justification. Plaintiffs were unable to persuade the district court of the lack of educational justification; indeed, the district court found that in each instance, there were reasonable and rational explanations for the decisions. We do not believe it is either necessary or useful to again discuss each challenged action or failure to act. With respect to many of the policy decisions, plaintiffs' brief merely repeats and reviews the evidence presented below and argues that the district court's rationale on remand falls squarely back on the neighborhood school justification. We read the district court's opinion differently. Rather than taking the neighborhood school policy at face value, the district court sensitively and thoughtfully examined the historical and demographic underpinnings of the policy as it has been applied in the San Jose Unified School District. That analysis reveals that it was not slavish adherence to the neighborhood school policy that produced the racial imbalance, nor did adherence to the policy raise an inference of segregative intent or in all respects dispel such an inference otherwise raised. The neighborhood school policy was properly considered as one factor, among many, that dispels the inference of segregative intent. We believe the district court's opinion articulates adequate bases, apart from the neighborhood school policy, for all of its findings of fact, and plaintiffs have failed to meet their burden of demonstrating that those findings are clearly erroneous. We do, however, find it necessary to discuss three fresh arguments interposed by plaintiffs. These concern transportation, faculty-staff assignments, and the state-imposed duty to integrate.

## II. TRANSPORTATION

As the district court explained, the San Jose Unified School District uses a great deal of busing, "both in terms of the number of students being transported (approximately one-third of the student population) and in terms of the money expended (over $850,000 per year)." 518 F.Supp. at 636. The district court found that the vast majority of busing occurs within attendance areas; however, transportation outside attendance areas is quite commonly used for special schools and programs. *Id.* The district court further found that school officials were aware the school district could not be integrated without busing, yet officials remained adamantly opposed to busing for purposes of integration. *Id.* at 637.

Plaintiffs have used the foregoing findings to construct two arguments. First, plaintiffs contend that, in the face of school officials' knowledge that the district would probably remain segregated without some form of busing, the consistent refusal to consider busing is compelling evidence of segregative intent. The district court found, however, that although this evidence was "particularly disturbing," when viewed in context along with all the other evidence it would not support a finding of segregative intent. *Id.* at 637–38. This court is no less disturbed by defendants' unwillingness to consider busing as a means of alleviating the racial imbalance. The issue is close, but the district judge weighed the evidence carefully and his findings are well-reasoned. Applying the very narrow standard of review articulated by the Supreme Court in *Pullman Standard v. Swint,* we are not prepared to say the district court clearly erred in finding the evidence insufficient to show segregative intent.

Plaintiffs' second argument relies on an opinion of this court recently affirmed by the Supreme Court, *Washington v. Seattle School District No. 1,* —— U.S. ——, 102

S.Ct. 3187, 73 L.Ed.2d 896 (1982). Plaintiffs contend that defendants' policy of using wide-scale busing for numerous purposes, but not for integration, draws the same sort of impermissible racial classification that was condemned in *Seattle School District No. 1.* We disagree.

In *Seattle School District No. 1,* Washington voters approved an initiative that sought to prohibit "direct or indirect" student assignments to a school other than the one "geographically nearest or next nearest the student's place of residence . . . and which offers the course of study pursued by such student." See Wash.Rev.Code § 28A.26.010 (1981). The initiative contains such broad exceptions,[1] however, that it became evident the measure was directed solely at desegregative busing. The district court so found.[2]

The Supreme Court agreed with this court and the district court that the initiative drew a racial classification because it prohibited school districts from acting only in matters involving racial criteria. *Id.* at ——, 102 S.Ct. at 3195–96, 73 L.Ed.2d at 907–908. Relying on the principle enunciated in *Hunter v. Erickson,* 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), and *Lee v. Nyquist,* 318 F.Supp. 710 (W.D.N.Y.1970), the Court struck down the initiative as an unconstitutional attempt to restructure the political process to place obstacles in the path of racial minorities. As the Court explained, "In the absence of a constitutional violation, the desirability and efficacy of school desegregation are matters to be re-solved through the political process. For present purposes, it is enough that minorities may consider busing for integration to be 'legislation that is in their interest,'" and an initiative that restructures the political process so as to bar minorities from achieving such legislation cannot stand under the Fourteenth Amendment. —— U.S. at ——, 102 S.Ct. at 3197, 73 L.Ed.2d at 909.

The distinction from our case is apparent. We have been cited to no legislation in California that disrupts or interferes in any way with the decision-making authority of school districts.[3] Indeed, the basis for plaintiffs' complaint is entirely inconsistent with the theory advanced in *Seattle School District No. 1.* Plaintiffs contend, in essence, that the San Jose Unified School District enjoys entirely *too much* discretion in desegregation matters, in that the district has consistently refused to revise its policy on busing for integration. But because the school district's policy does not violate the Fourteenth Amendment, plaintiffs' only recourse is the political process which, in contrast to the process examined in *Seattle School District No. 1,* remains entirely open to them.

## III. FACULTY–STAFF ASSIGNMENTS

▇ At trial, school district officials conceded that Spanish-surnamed teachers were assigned to predominantly Spanish-surname schools. The officials claimed that the assignments were for educational purposes,

---

1. The initiative permits the school board to assign a student beyond his neighborhood school if he "requires special education, care or guidance" or if "there are health or safety hazards, either natural or man made, or physical barriers or obstacles . . . between the student's place of residence and the nearest or next nearest school" or if "the school nearest or next nearest to his place or residence is unfit or inadequate because of overcrowding, unsafe conditions or lack of physical facilities." Wash.Rev.Code § 28A.26.010 (1981).

2. "Except for racially-balancing purposes, Initiative 350 permits local school districts to assign students other than to their nearest or next nearest schools for most, if not all, of the major reasons for which students are at present assigned to schools other than the nearest or next nearest schools." *Seattle School District No. 1 v. Washington,* 473 F.Supp. 996, 1010 (W.D.Wash.1979).

3. If legislation did exist that removes certain powers from school districts, it would not, of itself, be objectionable. "[T]he political majority may generally restructure the political process to place obstacles in the path of everyone;" the constitutional infirmity obtains only "when the state allocates governmental power nonneutrally, by explicitly using the racial nature of a decision to determine the decisionmaking process." *Washington v. Seattle School District No. 1,* —— U.S. ——, ——, 102 S.Ct. 3187, 3195, 73 L.Ed.2d 896, 907 (1982).

such as providing role models for students and making Spanish-speaking teachers available. Due to lack of evidence, however, the district court was unable to conclude that the disproportionate assignment of Spanish-surnamed teachers and staff resulted from those racially-neutral purposes. 518 F.Supp. at 641.

On appeal, plaintiffs characterize the district court's discussion as a finding that defendants' faculty-staff assignment policies were unconstitutional. Citing Fed.R. Civ.P. 15(b), plaintiffs request this court to remand with instructions to allow an amended complaint in light of the evidence adduced at trial on this "unconstitutional" practice. We believe the district court's opinion makes clear that the faculty-staff issue was not tried independently, but only as an element of evidence to prove segregative intent.[4] Thus, we will not permit a conforming amendment under rule 15(b), see C. Wright & A. Miller, *Federal Practice and Procedure* § 1489, at 449 (1971), particularly since plaintiffs never pursued that theory nor sought an amendment from the district court during some eleven years of litigation. If the school district's alleged practice continues today, these proceedings are not res judicata to a subsequent suit for an injunction. In this regard, we express no opinion on the constitutionality of the school district's faculty-staff assignment policy.

### IV. STATE–IMPOSED DUTY TO INTEGRATE

*Dayton* and *Columbus* make clear that units of government which had a dual system of schools before *Brown v. Board of Education,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (Brown II), are under an affirmative duty to "eradicate the effects of that system." *Dayton,* 443 U.S. at 537, 99 S.Ct. at 2979, 61 L.Ed. at 733; *Columbus,* 443 U.S. at 458–59, 99 S.Ct. at 2946–47, 61 L.Ed.2d at 677. Plaintiffs here urge that any time a school district has an affirmative duty to integrate, under *Dayton* and *Columbus* a *presumption* of segregative intent arises from evidence of actions with foreseeably segregative consequences. Emphasizing that school districts in California are under a state-imposed duty to alleviate desegregation, plaintiffs argue that such a presumption should arise here.

Plaintiffs' reasoning is faulty on two grounds. First, the "presumption" plaintiffs refer to in *Dayton* was actually a burden imposed on the school district of "showing that actions that increased or continued the effects of the dual system serve important and legitimate ends." *Dayton,* 443 U.S. at 538, 99 S.Ct. at 2979, 61 L.Ed.2d at 734. It was clearly not a presumption shifting the burden of proving segregative intent, for proof of segregative intent in that case was unnecessary. Second, any duty imposed by state constitutional law has no effect on this proceeding other than as a circumstantial evidence of segregative intent. We have been curious from the outset why, if such an affirmative duty existed under state law, plaintiffs did not proceed in the more attractive state forum.[5] In any event, the forum plaintiffs did choose properly limited its consideration of the state law duty to proof of the segregative intent necessary for a federal constitutional violation. 518 F.Supp. at 642. The district judge's finding that school officials were justifiably confused about the scope of their duty is soundly based in the record

---

4. "However, this court is concerned, in the context of this suit, only with any effect that this assignment policy had on the segregation of the student population of the schools." 518 F.Supp. at 641.

5. Until 1979, the California Constitution empowered state courts to order desegregation measures regardless of whether the segregation was *de jure* or *de facto* in origin. *See Crawford v. Board of Education,* 17 Cal.3d 280, 130 Cal. Rptr. 724, 551 P.2d 28 (1976). In 1979, Califor-

nia voters ratified Proposition I, an amendment to the due process and equal protection clauses of the state constitution. Proposition I conforms the power of state courts to order pupil school assignment and transportation to that exercised by federal courts under the Fourteenth Amendment to the United States Constitution. Proposition I was upheld in *Crawford v. Board of Education,* —— U.S. ——, 102 S.Ct. 3211, 73 L.Ed.2d 948 (1982).

and his finding that failure to comply with the state duty did not suggest segregative intent is not clearly erroneous. Accordingly, the district court's judgment is

AFFIRMED.[6]

FARRIS, Circuit Judge, dissenting:

Minority students are not the only ones who suffer the harmful effects of segregation. All the other students in the segregated system, as well as teachers and administrators, are victims when minority students are removed from the mainstream of public education. The loss is not limited to those within the school system but is borne by all of us who have a stake in the future of this nation. If the limits of the law compel us to perpetuate the exclusion of minorities from the mainstream of our national life, we must do so only after the most careful deliberation.

If the law of desegregation continues to develop in what the majority conceives as its present direction, it will be all but impossible for a minority litigant to make the showing of "segregative intent" necessary to establish that an undeniably segregated school system has been *unlawfully* segregated. There is no dispute that the San Jose public school system is racially imbalanced. The record leaves no doubt that the Board was fully aware that their chosen course of action over a period of two decades would perpetuate this segregation. The Board does not deny this.

In tort law a person is deemed to "intend" the reasonably foreseeable consequences of his actions. In cases of racial discrimination, however, the foreseeable segregative effect of institutional action will not, in and of itself, support a finding of "segregative intent." *See Dayton Board of Education v. Brinkman,* 443 U.S. 526, 536 n. 9, 99 S.Ct. 2971, 2978 n. 9, 61 L.Ed.2d 720 (1979). This more rigorous intent standard, however, does not require that patterns of behavior which serve no other end than to maintain and perpetuate a segregated public school system be characterized as unintentional.

The record reflects that for twenty years and more the Board of Trustees of the San Jose Unified School District has known that the public schools of San Jose were improperly segregated. It has done nothing to correct the situation, even though it has had numerous opportunities for reform. Although I have the utmost respect for the trial judge, I disagree with his conclusion that the record demonstrates that the Board maintained a sincere commitment to desegregation in spite of its failure to act. The Board's actions speak louder than its words. It is not disputed that the Board has taken no action to accomplish its stated goal of a desegregated system. The district court found that "the district has clearly gotten cold feet on a number of occasions and has failed to follow through on its claimed goal of desegregating the district." *Diaz II,* 518 F.Supp. at 638. There is nothing in the record or in the district court's analysis to support its conclusion that "the desire [to desegregate] often expressed is real, even if there has been some reluctance in the execution." *Id.*

The district court found and the record shows that there were abundant opportunities for actions which would promote desegregation. Whenever the Board was presented with a choice, whenever it had an opportunity to change direction, it made the choice that confirmed and perpetuated segregation in the San Jose public schools. Such consistency in the face of the undeniable fact of segregation is, in my opinion, a clear expression of the "segregative intent" necessary to support a finding of unlawful segregation.

The effect of the majority opinion is to hold that a reluctant school board that talks about desegregation but refuses to do anything to promote it has done all that the constitution requires. I fear that the effect of the majority's position will be that a school board that wishes to maintain a segregated system in the future will need only

---

**6.** In so doing, we endorse the perceptive admonition of Chief Judge Peckham in the Conclu-

sion of his exhaustive and thoughtful opinion of July 15, 1981. 518 F.Supp. at 644.

discuss its goals of desegregation, commit itself on paper, and then reject or refuse to take advantage of every opportunity for reform. We cannot permit "segregative intent" to be so easily camouflaged.

I do not ignore the district court's admonition that "[t]his court would be extremely disturbed and saddened if its decision in this case was interpreted by either of the parties to this action or the public as encouragement to the Board to lay back and accept the consequences of the imbalance." *Id.* at 644. I simply find it insufficient to address the fact that the public schools of San Jose are segregated and the Board has wilfully rejected every proposal to improve the racial imbalance. The district court expresses its concern about the future. This action was brought to correct the evils of the present. Having prevailed on this sordid record, the Board need never act to reform this school system.

I recognize the narrow limits imposed on our review by Fed.R.Civ.P. 52(a) and *Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). Even so, I find that the district court, in an admirably thorough and articulate opinion, erred in finding that certain actions of the Board did not demonstrate the "segregative intent" necessary to support a finding of unlawful segregation. Nothing in the record supports the district court's speculation that "[i]t may well be that the Board hoped that some other solution to the problem of integration could be found, short of large-scale bussing." *Diaz II* at 637.

My concern is reinforced by the district court's finding that the Board consistently refused to implement other suggestions for reducing the racial imbalance in the San Jose schools. These suggestions included the creation of magnet schools and education parks, as well as the implementation of open enrollment and voluntary bussing. The district court found "perfectly reasonable and rational explanations" for the Board's refusal to implement any of these proposals. *Id.* at 638. The *only* support in the record for such a conclusion is the finding that the Board believed that nothing

short of busing could remedy the racial imbalance in the San Jose schools, but the record also shows that the Board refused even to consider busing as a remedy. In fact the Board refused to consider implementing *any* proposal which might have reduced the racial imbalance of the San Jose public schools.

Further, the district court's conclusion that the Board's behavior during the bond issue election campaign did not support an inference of "segregative intent" is not consistent with the undisputed facts. The Board issued public statements that the failure to pass the bond issue would result in the transfer of students from one attendance area to another. It also gave repeated assurances that it would not use bond issue money to finance busing for the purpose of desegregation, although busing for other purposes was widely used throughout the system. I conclude that the message of those two statements upon the voters in San Jose was "if you don't vote for the bond issue, we will have to desegregate" and "if you do vote for the bond issue, we promise not to use the money to desegregate." This, together with the court's findings, is more than sufficient to support an inference of "segregative intent."

The Board rejected all of QUEST's recommendations for correcting the racial imbalance. In spite of this, the district court concluded that "the Board was trying its best, in a difficult situation, to continue to move forward towards some affirmative effort to integrate." *Id.* at 640. There is no evidence in the record that the Board ever "move[d] forward" or was "continu[ing] to move forward." The district court set forth its rationale for refusing to find inferences of "segregative intent":

To make such an inference would be to warn all school districts which have racially imbalanced schools not to make any affirmative moves towards integration unless they are certain that they will succeed; otherwise, the effort will become the basis for an inference of discriminatory purpose on their part, rather than an inference of the very opposite intent which in fact motivated them.

*Id.* at 641. I agree that a finding of "segregative intent" would broadcast a message to other segregated school systems, but I disagree with the district court on the substance of that message. A finding of "segregative intent" here would signal school boards that it is not enough merely to talk about desegregation while avoiding all proposals that might remedy the evil. I must respectfully reject the district court's conclusion that even if "the Board ultimately did little to implement its stated commitment to integration," it nevertheless merits congratulations for "its willingness to stick by this position [in favor of integration], even if just rhetorically." *Id.* at 641.

I recognize that the federal constitution does not require the Board to integrate the public schools of San Jose. The Board's only obligation is that it not segregate intentionally. The record and the district court's findings compel my conclusion that the Board failed to meet this obligation. I would reverse with instructions to fashion a remedy to correct the unconstitutional segregation in the San Jose public school system. It is of no comfort to the plaintiffs that the district court concluded that "[c]ontinued failure to choose the path which leads towards less ethnic imbalance in the schools could well, at some future time, form the basis for a conclusion that the school officials do, in fact, wish to keep the Anglos and the Spanish-surnamed students segregated in the SJUSD." *Id.* at 644. More than twenty years have elapsed with no break in this continuing failure. This, in my opinion, is sufficient to support an inference of "segregative intent."

I would reverse.