**M.W. BRAXTON, Plaintiff–Appellant,**

v.

**UNITED STATES of America, Defendant–Appellee.**

No. 85–3926.

United States Court of Appeals, Eleventh Circuit.

Oct. 24, 1988.

Richard C. Trollope, Panama City, Fla., for plaintiff-appellant.

Mervyn Hamburg, U.S. Dept. of Justice, Washington, D.C., Dexter W. Lehtinen, U.S. Atty., Pensacola, Fla., for defendant-appellee.

Before TJOFLAT and EDMONDSON, Circuit Judges, and EATON *, Senior District Judge.

TJOFLAT, Circuit Judge:

I.

This case began as an action to quiet the title to a 690–acre peanut farm in Jackson County, Florida. M.W. Braxton, the appellant, claimed title to the farm under a warranty deed executed in December 1980. Braxton brought this suit to remove the cloud on his title which was created by an order of the district court entered in October 1981, at the conclusion of a criminal prosecution under the RICO[1] statute, forfeiting the farm to the United States.[2] The

---

* Honorable Joe Eaton, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

1. RICO is an acronym for the Racketeer Influenced and Corrupt Organizations statute, enacted in 1970 and contained in Chapter 96, Title 18 of the United States Code.

2. The indictment charged several individuals under 18 U.S.C. § 1962(d) (1976) for conspiring to operate a marijuana smuggling and distribu-

district court dismissed Braxton's suit for want of subject matter jurisdiction, and Braxton appealed.

While Braxton's appeal was pending, Congress amended RICO's forfeiture provisions to provide that anyone claiming an interest in property forfeited to the United States could petition the district court to determine the validity of his interest. *See* Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, § 302, 98 Stat. 1837, 2040 (1984) (now codified at 18 U.S.C. § 1963(*l*)(2) (Supp. IV 1986)).[3] The parties then asked us to vacate the district court's dismissal and to remand the case for further proceedings under the amended forfeiture provisions. We did so, *United States v. Cobb*, 762 F.2d 1021 (11th Cir.1985) (unpublished), and, on remand, Braxton petitioned the district court pursuant to 18 U.S.C. § 1963(*l*) (Supp. IV 1986)[4] to set aside the forfeiture of the farm.

In his petition, Braxton alleged, as required by section 1963(*l*)(6)(B), that he was "a bona fide purchaser for value of the [peanut farm] and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture" because of the smugglers' activities in violation of 18 U.S.C. § 1962(d).[5] The Government, in its response, admitted that Braxton was in possession of a warranty deed purporting to give him title to the farm, but denied that he had purchased the farm for value. According to the Government, Braxton had paid nothing for the farm and had been holding title to the property as the smugglers' nominee. The Government also denied that Braxton had

tion enterprise in violation of federal drug laws. Following their conviction, the district court, acting pursuant to 18 U.S.C. § 1963 (1976), ordered the subject peanut farm forfeited to the Government because the defendants had "acquired" and "maintained" the farm "in violation of" section 1962(d). The court entered several forfeiture orders, one with respect to each convicted defendant. For convenience, we refer to the orders collectively as one order.

Subsequent to the entry of the forfeiture order, the defendants and a shell corporation they formed to hold title to the farm, Cottondale Farms, Inc., quitclaimed the farm to the United States. In his complaint, Braxton requested the district court to set aside these deeds in addition to the forfeiture order.

3. Section 302 of the Comprehensive Control Act was originally codified at 18 U.S.C. § 1963(a)—(m). In 1986, while Braxton's prior appeal was pending, subsections (e)—(m) were redesignated (d)—(*l*). Pub.L. No. 99–646, § 23, 100 Stat. 3597 (1986).

4. Section 1963(*l*) provides, in pertinent part, that following the entry of an order of forfeiture,

(2) Any person, other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States ... may ... petition the court for a hearing to adjudicate the validity of his alleged interest in the property. The hearing shall be held before the court alone, without a jury.

(3) The petition shall ... set forth the nature and extent of the petitioner's right, title, or interest in the property, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the property, any

additional facts supporting the petitioner's claim, and the relief sought.
. . . .

(6) If, after the hearing, the court determines that the petitioner has established by a preponderance of the evidence that—

(A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or

(B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of the purchase reasonably without cause to believe that the property was subject to forfeiture under this section;

the court shall amend the order of forfeiture in accordance with its determination.

(7) Following the court's disposition of all petitions filed under this subsection, ... the United States shall have clear title to property that is the subject of the order of forfeiture and may warrant good title to any subsequent purchaser or transferee.

5. Braxton acquired title to the peanut farm after the commission of the act that gave rise to the forfeiture of the farm; accordingly, he could not have obtained relief under section 1963(*l*)(6)(A), which permits a petitioner to defeat forfeiture if he can prove by a preponderance of the evidence that his title to the forfeited property "was vested in [him] at the time of the commission of the act which gave rise to the forfeiture...." *See supra* note 4.

no cause to believe that the property was subject to forfeiture at the time he acquired his warranty deed.

Following a nonjury trial, the district court announced its findings of fact and conclusions of law from the bench. The court found that Braxton had been holding title to the farm as the smugglers' nominee,[6] and therefore that he failed to prove that he was "a bona fide purchaser for value" of the farm. The court also concluded that Braxton failed to prove that he took title to the property without knowledge that it was subject to forfeiture as a result of its use in the drug smuggling venture. The court accordingly dismissed Braxton's petition.

After the court rendered its decision, the Government requested the court to enter a money judgment against Braxton in a sum equivalent to the fair rental value of the farm during the period that Braxton occupied the farm following its forfeiture to the United States. The court stated that it would consider the Government's request at a subsequent hearing, to be held two months later, and declared a recess in the proceeding until that hearing.

Prior to the hearing, Braxton moved the court to reconsider its decision dismissing his petition. He also objected, on alternative grounds, to any further consideration of the Government's claim for rent. Braxton's first ground was that RICO provided no basis for charging him rent; his second ground was that the Government had waived its claim by not raising it earlier in the proceeding.

The court summarily denied Braxton's motion to reconsider. Then, after hearing argument of counsel on the rent issue, it ruled for the Government; the court concluded that RICO's forfeiture provisions authorized it to make equitable adjustments between the parties and thus to require Braxton to pay a reasonable rent. After announcing its ruling, the court recessed the hearing for twelve days to enable the parties to marshall their evidence on the question of what constituted a reasonable rent for the period that Braxton occupied the farm after its forfeiture. When the hearing resumed, the parties put on their evidence, and the court found that $59,055.97 constituted a reasonable rent; it gave the Government judgment for that amount, plus interest, and Braxton took this appeal.

## II.

### A.

After Braxton lodged this appeal, the district court, in a separate proceeding brought by the mortgagee of Braxton's grantee against that grantee, Braxton, and the United States, entered a final judgment of foreclosure in favor of the mortgagee. The parties agree that that judgment had the effect of extinguishing their respective claims to the subject property. Braxton's claim for quiet title relief is therefore moot.[7] *See DeFunis v. Odegaard,* 416

---

**6.** A nominee is "one designated to act for another as his representative in a rather limited sense." *Schuh Trading Co. v. Commissioner,* 95 F.2d 404, 411 (7th Cir.1938). "[N]ominee in its commonly accepted meaning connotes the delegation of authority to the nominee in a representative or nominal capacity only, and does not connote the transfer or assignment to the nominee of any property in, or ownership of, the rights of the person nominating him." *Ott v. Home Sav. & Loan Ass'n,* 265 F.2d 643, 647 (9th Cir.1958) (quoting *Cisco v. Van Lew,* 60 Cal.App.2d 575, 583–84, 141 P.2d 433, 438 (1943)); *see also* 66 C.J.S. *Nominee* (1950) (citing *Schuh Trading*).

**7.** Given this change in the circumstances, Braxton now asserts, under various theories of liability, that he is entitled to money damages for

losses he incurred as a result of the forfeiture. He did not present his claim for damages to the district court; therefore, we do not consider it in this appeal. *See* C. Wright & A. Miller, *Federal Practice & Procedure* § 1489, at 449 (1971); *International Ladies' Garment Workers' Union v. Donnelly Garment Co.,* 121 F.2d 561, 563 (8th Cir.1941). The question still remains, though, whether we should remand the case to the district court to allow Braxton to present his claim for damages. We decline to remand the case for two reasons. First, Braxton cites no legal basis for his damages claim. Second, Braxton knew, at the time he was prosecuting his petition in the district court, that his interest in the peanut farm was likely to be extinguished as a result of the mortgage foreclosure proceeding, which was then pending in the district court, and that his only possible recourse against the

U.S. 312, 316, 94 S.Ct. 1704, 1705–06, 40 L.Ed.2d 164 (1974); *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971).

The controversy concerning the validity of Braxton's warranty deed is still live, however, but in a different context—the Government's claim for rent, which turns on the validity of that deed. Specifically, two questions are presented: whether, as the district court found, Braxton held title to the farm as the drug smugglers' nominee, and, if so, whether applicable substantive law requires Braxton to pay the Government rent for occupying its land. We address these questions in parts B. and C. below.

### B.

We review the district court's finding that Braxton held title to the farm as the smugglers' nominee under the clearly erroneous standard. *See McCleskey v. Kemp*, 753 F.2d 877, 898 (11th Cir.1985) (en banc), *aff'd* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). Therefore, unless, after reviewing all the evidence presented at trial, we are "left with the definite and firm conviction that a mistake has been committed," the district court's finding must stand. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *see also McCleskey*, 753 F.2d at 898.

The evidence before the district court revealed the following. During the latter part of the 1970's, Clifford B. Wentworth, Clyde W. Cobb, and Thomas D. Abbey were involved in a large scale marijuana smuggling and trafficking venture; they smuggled Colombian marijuana into the United States through the Florida Panhandle and distributed it to various parts of the country. In the late fall of 1977, these smugglers found themselves in need of a "stash house," a storage place and distribution center for the marijuana, in the Jackson County area, to store a load of marijuana that was about to be off-loaded in the

Gulf of Mexico. Believing that a farm would provide an ideal storage site, Cobb instructed Wentworth, who was an attorney, to find a suitable farm and to handle its purchase. Wentworth, in turn, contacted Braxton, his father-in-law, who had a farm in Jackson County and was likely to know of any farms for sale in the area. Braxton told him about several farms that were on the market, including the one in this case which was adjacent to Braxton's farm.

Cobb decided to purchase the farm and instructed Wentworth to form a corporation to hold title to the property. Carrying out Cobb's instruction, Wentworth incorporated Cottondale Farms, Inc. (Cottondale), and designated Abbey as the company's president, secretary-treasurer, resident agent, and sole shareholder. On December 22 or 23, 1977, Braxton's son, Kenneth, introduced Cobb and Wentworth to Walter Killin, the owner of the farm. A few days later, Cobb, Wentworth and Killin negotiated a contract for the purchase of the farm by Cottondale at a price of $690,000. Cottondale would pay this price by giving Killin at closing $175,000 in cash and a $152,500 second mortgage and by assuming the balance due on a $375,000 first mortgage Killin had given to an insurance company.

The closing took place on March 31, 1978, and Cottondale took title to the farm. Shortly thereafter, Braxton began to farm the land; he planted and harvested peanuts, soybeans, and corn and in general managed the land as if it were part of his own acreage.

On December 9, 1980, as federal law enforcement authorities were closing in on the drug smugglers, Cottondale gave Braxton a warranty deed to the farm. The deed recited that Braxton paid "$10 and other good and valuable considerations" for the farm and that he assumed and agreed to pay the two mortgages which still encumbered the property and had unpaid principal balances totaling $429,000.

Government would be a claim for monetary compensation. Yet, he failed to seek any compensation. In our view, justice does not require

that he be given an opportunity to do so now. *See, e.g., Diaz v. San Jose Unified School Dist.*, 705 F.2d 1129 (9th Cir.1983).

The district court found that contrary to these deed recitals, Braxton gave Cottondale nothing of value for the farm; the transaction was an absolute sham, devised by the smugglers to keep the farm from being forfeited to the Government. As the court stated, Braxton "could have walked away" from the deal at any time;[8] he was merely the smugglers' "nominee." Based on our review of the record, we are not "left with the definite and firm conviction" that the district court erred in finding that Braxton was a mere nominee.

### C.

Having affirmed the district court's finding that Braxton held title to the farm as a mere nominee, we turn to the next question: whether Braxton is liable to the Government for rent. In the district court's view, 18 U.S.C. § 1963(*l*) (Supp. IV 1986) obligates one who occupies forfeited land to pay the Government a reasonable rent for the period of his occupancy.

■ We find nothing in the text of section 1963(*l*) to support the district court's conclusion. Section 1963 authorizes a district court to "appoint receivers, conservators ... or trustees, or take any other

action to protect the interest of the United States" in the forfeited property, *see* 18 U.S.C. § 1963(e) (Supp. IV 1986),[9] but the statute does not make a person standing in Braxton's shoes liable to the government for rent. If such liability exists, it must be created by a law other than the RICO forfeiture provision.

■ We know of no federal law that would require Braxton to pay the Government the rent it seeks. Florida law, however, would impose the obligation. Under Florida law, the owner of land is entitled to reasonable rent, or "mesne profits," from one who occupies the land without the owner's permission.[10] We see no reason for not applying Florida substantive law in this case and accordingly do so; the Government is entitled to rent from Braxton, measured by the reasonable rental value of the peanut farm, for the period he occupied the farm after its forfeiture. The district court fixed this rent at $59,055.97, plus interest. The evidence in the record amply supports this figure, and we therefore accept it.[11] We must affirm the district court's award unless, as Braxton contends, the Government waived its claim for rent by presenting it too late in the proceeding.[12]

8. Braxton and the smugglers had an understanding that Cottondale would not look to Braxton to pay off the mortgages or to hold it harmless for any deficiency judgment that Killin might obtain against Cottondale in a mortgage foreclosure suit.

9. In addition, as soon as an order of forfeiture is entered, the district court must authorize the Attorney General to seize the forfeited property "upon such terms and conditions as the court shall deem proper." 18 U.S.C. § 1963(e) (Supp. IV 1986). Once in possession of the property, the Attorney General has broad discretion as to the manner in which he disposes of it. *See id.* § 1963(e), (g).

10. Such rent is often collected in an ejectment action, *see generally* 20 Fla.Jur.2d *Ejectment and Related Matters* §§ 22, 23 (1980); *Wismer v. Alyea*, 103 Fla. 1102, 138 So. 763, 765 (1932); *Wilkerson v. Gibbs*, 405 So.2d 1053, 1055–57 (Fla.Dist.Ct.App.1981) (finding common law action of trespass for mesne damages incorporated into Florida statutory ejectment scheme), or in an action to quiet title, *see, e.g., McGriff v. McGill*, 62 So.2d 28 (Fla.1952).

11. The district court arrived at this award in the following manner. The court began by using

the rent Braxton agreed to pay the smugglers in 1978, after Cottondale took title to the farm. The court then adjusted this figure downward to reflect the decline in market value during the period that Braxton farmed the land. The court gave Braxton credit for two mortgage payments and for real estate taxes he paid in 1981. Finally, the court increased the figure by treating a payment one of the smugglers made to Braxton (to assist him in making the 1981 mortgage payments) as a return of rent. Given the evidence in the record, we find no fault in the court's award.

12. Braxton does not challenge the district court's authority in a section 1963(*l*) proceeding, such as the instant case, to entertain a claim of the sort the Government presents here. As noted earlier, section 1963(*l*) authorizes the district court, once a forfeiture order has been entered, to appoint a receiver to take possession of the forfeited property. Obviously, a receiver so appointed would have the obligation to collect any rent that might be due and owing by a party occupying the property, whether the party occupied the property as a matter of right, as under a lease, or wrongfully, as in the case of trespass. If the occupier resisted

### D.

█ As Braxton correctly observes, the Government should have counterclaimed for rent when it responded to his petition, for the basis of the claim was well known at that time. Federal Rules of Civil Procedure 13(f), however, gave the Government the right to seek leave of court to file its counterclaim later on in the proceeding, even at trial.[13] Rule 13(f) provides that: "When a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice requires, the pleader may by leave of court set up the counterclaim by amendment." The decision to grant leave to file a counterclaim is an exercise of discretion, which will not be disturbed absent a showing of abuse. We find no abuse here.

When the Government asked the district court for leave to file its claim for rent, the court gave the parties two months to research the question of the Government's right to rent, and then, after it held for the Government, the court gave the parties two additional weeks to assemble their proof on what constituted reasonable rent. When the evidentiary hearing on that issue convened, the parties were fully prepared and put on their evidence. Nothing in the record indicates that Braxton was prejudiced in any way by the Government's delay in presenting its claim; he had a full and fair opportunity to confront the Government's proof, to put on his evidence, and to persuade the court to his point of view.

### III.

In summary, we dismiss as moot Braxton's petition for relief under 18 U.S.C. § 1963(*l*) (Supp. IV 1986). We affirm the district court's judgment awarding rent to the Government.

**DISMISSED IN PART; AFFIRMED IN PART.**

EATON, Senior District Judge, concurring in part and dissenting in part.

I concur with the majority save for the holding that Braxton is liable to the government for rent.

I see no showing of oversight, inadvertence, or excusable neglect such as to allow the government to file, during the final stage of this protracted proceeding, a counterclaim seeking past due rent from Braxton. And, in my opinion, justice did not require the allowance of the counterclaim.

For almost four years following the order of forfeiture, the government acquiesced in Braxton's farming the subject land.[1] During that period the government did not avail itself of the broad remedies available to it to seize the property and maintain the value of the farmland. Because Braxton's farming of the land benefitted the land,[2] the government never suggested to Braxton that he give up the farm. Nevertheless, during the final stages of the litigation, the government was allowed to proclaim itself the landlord and Braxton the hostile tenant, thereby avoiding the financial risks that go part and parcel with raising peanuts, soy beans, and corn on a West Florida farm. I see no equity in that.

RICO was designed in such a way as to cut a wide swath, but in my opinion the windrow was piled far too high in this case.

---

the receiver's demand for rent, one would expect that the receiver would repair to the district court for relief and that the district court would grant it, calling on its power to "enter such appropriate restraining orders or injunctions ... or take any other action to protect the interest of the United States." 18 U.S.C. § 1963(e) (Supp. IV 1986). If the district court could draw on this statutory authority to aid the receiver in collecting rent, it logically follows that it could grant the relief the Government seeks in this case.

**13.** The proceeding was ancillary to a criminal proceeding and, arguably, the Federal Rules of Civil Procedure did not apply. Because the proceeding was civil in nature, however, we believe that the Federal Rules of Civil Procedure were applicable. *See* Fed.R.Civ.P. 1 (rules apply to "suits of a civil nature").

**1.** A mortgage foreclosure proceeding against the land was eminent.

**2.** The government's appraiser testified at trial that if the land had lain fallow it would have become worthless.